1  Edward W. Swanson (SBN 159859)
2  August P. Gugelmann (SBN 240544)
   SWANSON & McNAMARA LLP
3  300 Montgomery Street, Suite 1100
   San Francisco, CA 94104
4  Telephone: (415) 477-3800
   Facsimile: (415) 477-9100
5  Email: ed@smllp.law
   Email: august@smllp.law

6  Neal J. Stephens (SBN 152071)
7  Jeffrey B. Schenk (SBN 234355)
   Thao Donnelly (SBN 355632)
8  JONES DAY
   1755 Embarcadero Road
9  Palo Alto, CA 94303
   Telephone: (650) 739-3939
10 Facsimile: (650) 739-3900
   Email: nstephens@jonesday.com
11 Email: jbschenk@jonesday.com
   Email: tdonnelly@jonesday.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br>vs.<br>DAVID DUONG,<br><br>    Defendant. | Case No. CR 25-0003 YGR<br><br>**REPLY IN SUPPORT OF MOTION FOR FRANKS HEARING AND FOR SUPPRESSION OF EVIDENCE**<br><br>Date: March 5, 2026<br>Time: 10:00 a.m.<br>Court: Hon. Yvonne Gonzalez Rogers |

**TABLE OF CONTENTS**

| | | | |
|---|---|---|---|
| I. | INTRODUCTION | | 1 |
| II. | ARGUMENT | | 2 |
| | A. | SA Haunold's failure to uncover and include in the affidavit evidence undermining Co-Conspirator 1's credibility was reckless. | 2 |
| | B. | SA Haunold was reckless in claiming the June 9 shooting was a targeted attack coordinated by the Duongs. | 5 |
| | C. | The omitted information was material to the affidavit's showing of probable cause as to David Duong. | 7 |
| | D. | The affidavit fails to establish probable cause to search David Duong's house or car. | 11 |
| III. | CONCLUSION | | 12 |

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Coolidge v. New Hampshire*,
   403 U.S. 443 (1971) .................................................................................................... 8

*DeLoach v. Bevers*,
   922 F.2d 618 (10th Cir. 1990) ..................................................................................... 3

*Franks v. Delaware*,
   *438 U.S. 154 (1978)* ........................................................................................... passim

*Georgia v. Randolph*,
   547 U.S. 103 (2006) ................................................................................................... 11

*Lange v. California*,
   594 U.S. 295 (2021) ................................................................................................... 11

*United States v. Brown*,
   631 F.3d 638 (3d Cir. 2011). ....................................................................................... 2

*United States v. Chesher*,
   678 F.2d 1353 (9th Cir. 1982) ................................................................................. 2, 4

*United States v. Gifford*,
   727 F.3d 92 (1st Cir. 2013) .......................................................................................... 3

*United States v. Leon*,
   468 U.S. 897 (1984) ................................................................................................... 10

*United States v. Loloee*,
   No. 2:23-CR-00320-KJM, 2025 WL 671107 (E.D. Cal. Mar. 3, 2025) ...................... 3

*United States v. Martinez-Garcia*,
   397 F.3d 1205 (9th Cir. 2005) ..................................................................................... 4

*United States v. Meling*,
   47 F.3d 1546 (9th Cir. 1995) ....................................................................................... 4

*United States v. Miller*,
   753 F.2d 1475 (9th Cir. 1985) ..................................................................................... 3

*United States v. Rajaratnam*,
   719 F.3d 139 (2d Cir. 2013) ........................................................................................ 3

*United States v. Ramos*,
  923 F.2d 1346 (9th Cir. 1991) ................................................................................ 11

*United States v. Ruiz*,
  257 F.3d 1030 (9th Cir. 2001) ................................................................................ 11

*United States v. Tanguay*,
  787 F.3d 44 (1st Cir. 2015) ............................................................................. 2, 3, 4

*United States v. Williams*,
  737 F.2d 594 (7th Cir. 1984) .................................................................................... 3

**STATE CASES**

*Steven M. Garber & Assocs. v. Eskandarian*,
  150 Cal. App. 4th 813 (2007) ................................................................................... 7

**FEDERAL STATUTES**

18 U.S.C. 1512(a) ............................................................................................................ 8

## I. INTRODUCTION

The government does not contest that significant evidence shows that Co-Conspirator 1, on whom it relied heavily in formulating its case against David Duong, is a fraudster of long standing. And the government does not contest that this information was readily available to SA Haunold at the time he swore out his affidavit. It argues instead that SA Haunold did not actually know the information about the extent of Co-Conspirator 1's fraudulent past at the time and that, as a matter of law, he had no duty to seek it out. The government is wrong on the law. An agent with serious reasons to doubt the credibility of his informant has a duty to seek out information that would be relevant to a magistrate judge's assessment of the informant's credibility, and the failure to do so is reckless.

Similarly, the government does not dispute that Co-Conspirator 1's—and the affidavit's—account of the June 9, 2024 shooting was wrong. Co-Conspirator 1 did not return fire after being shot at in a targeted attack orchestrated by the Duongs, a fact that the government does not contest. Instead, the government claims that the evidence showing Co-Conspirator 1 was lying was not available to SA Haunold at the time he swore out the affidavit. On this point, the government is wrong. At the time the agent submitted the affidavit in support of the search warrant, the investigation had already revealed that Co-Conspirator 1's version of events was inconsistent with evidence from other witnesses. The agent did not present that information to the magistrate judge, and his failure to include it in the affidavit was reckless.

The additional evidence about Co-Conspirator 1's long history of fraud and about the June shooting, if revealed to a magistrate judge, would have changed the probable cause assessment. The affidavit, once stripped of Co-Conspirator 1's unreliable statements, contains only scant documentary evidence regarding David Duong and fails to establish probable cause connecting David Duong with any scheme. David Duong has met his burden of making a "substantial preliminary showing" of false statements or of recklessness for the truth, and the Court should order a *Franks* hearing.

## II. ARGUMENT

### A. SA Haunold's failure to uncover and include in the affidavit evidence undermining Co-Conspirator 1's credibility was reckless.

The government does not dispute that the evidence undermining Co-Conspirator 1's credibility was readily available at the time SA Haunold submitted his warrant application. Instead, it argues that that this information was not actually known to SA Haunold at the time and therefore is irrelevant to the Court's analysis. *E.g.*, Dkt. 151 at 16 (claiming that "'availability' of additional impeachment information is not the standard under *Franks*"). The government is wrong. Case law demonstrates that in cases such as the one before the Court, the failure to uncover facts about an informant can amount to recklessness for purposes of a *Franks* motion.

In *United States v. Chesher*, 678 F.2d 1353, 1360 (9th Cir. 1982), the defendant raised a *Franks* challenge to a warrant affidavit claiming he was an active member of the Hells Angels. The challenge was based on a state investigative report, dated years before the affidavit, that said the defendant had left the gang. *Id.* at 1361. The government responded that its affiant "had no knowledge" of the report. *Id.* The Ninth Circuit found the affiant's failure to uncover the report reckless. *Id.* It pointed out that, by his own account, the affiant had been investigating the Hells Angels for years, including through collaboration with state and local law enforcement agencies, and that he had spoken on several occasions with the author of the report in question. *Id.* at 1361-62. It found that such "unexplained failure of an agent investigating Hells Angels in California, with these extensive contacts with other investigators, to discover, for almost four years, a report written by an agent with the California Bureau of Narcotics … tends to support a claim of recklessness." *Id.* at 1361. The affiant's recklessness was further demonstrated by his reliance on stale information. Taken together, these failings constituted the requisite "'substantial preliminary showing' of deliberate or reckless falsity" for a *Franks* hearing. *Id.* at 1362.

As *Chesher* illustrates, recklessness determinations are often "highly fact-dependent, and thus … carry little precedential value" because they "typically turn on what a particular officer did and either knew or should have known." *United States v. Brown*, 631 F.3d 638, 645 (3d Cir.

2011). In conducting this fact-specific inquiry, the history of an investigation and the affiant's familiarity with a source's background are relevant to determining whether the investigation into the information was sufficient. In *United States v. Tanguay*, 787 F.3d 44, 48 (1st Cir. 2015), the defendant argued that an affiant had reason to doubt the credibility of her informant and that it was reckless, given that knowledge, for the affiant not to undertake the investigation that would have uncovered the informant's prior conviction for filing a false police report. The district court denied a *Franks* motion, reasoning that (as the government argues here), "a failure to investigate fully could not constitute a reckless disregard for the truth." *Id.* at 52. The First Circuit reversed and remanded, holding that the lower court erred in its "assumption that a *Franks* violation could not arise out of a failure to include in a warrant affidavit facts not actually known to the affiant." *Id.* at 52-53. Citing *Chesher*, it held that an officer confronted with obvious reasons to doubt the veracity of an informant's allegations has a "duty of further inquiry" because, "after all, the officer is the only party who, in this context, has the tools to undertake any meaningful investigative work." *Id.* at 53; *see United States v. Loloee*, No. 2:23-CR-00320-KJM, 2025 WL 671107, at *17 (E.D. Cal. Mar. 3, 2025) ("[W]hen the government has reason to doubt the veracity and credibility of a reporting party or informant, 'that red flag may be sufficient to create a duty of further inquiry.'") (citing *Tanguay*).

      Other circuits agree that an allegation is made with reckless disregard for the truth if the affiant "in fact entertained serious doubts as to the truth of the allegations or where circumstances evinced obvious reasons to doubt the veracity of the allegations in the application." *United States v. Gifford*, 727 F.3d 92, 98 (1st Cir. 2013); *United States v. Reed*, 921 F.3d 751, 756 (8th Cir. 2019) (same); *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013) (same); *Brown*, *supra*, 631 F.3d at 645 (same); *DeLoach v. Bevers*, 922 F.2d 618, 622 (10th Cir. 1990) (same); *United States v. Williams*, 737 F.2d 594, 602 (7th Cir. 1984) (same). The cases relied on by the government (*Miller* and *Meling*) are consistent. In both, the Ninth Circuit looked beyond the affiants' subjective knowledge and evaluated the objective reasonableness of their investigative actions in light of what the affiants knew about the

informants. In neither was evaluation of recklessness restricted to a simple binary analysis of what the affiant knew or did not know.

In *United States v. Miller*, 753 F.2d 1475, 1478 (9th Cir. 1985), the "linchpin" of the defendant's challenge was the affiant's failure to disclose the informant's (Mr. Becker's) perjury conviction. The investigating officers obtained Becker's California rap sheet and a criminal history report from Oregon, and the court concluded they had made "diligent efforts to find out about Becker's background." *Id.* Because the perjury conviction was not mentioned in the reports the officers had obtained, the court found the officers could not be faulted for their failure to uncover it. *Id.* Thus, it was not enough for the government to say the agents did not know about the conviction; the court analyzed the reasonable diligence of the agent's efforts to research the informant's background in evaluating whether the agent had acted with reckless disregard.[1]

*United States v. Meling*, 47 F.3d 1546 (9th Cir. 1995), also relied upon by the government, similarly demonstrates that the affiant's history with and knowledge of the informant is relevant to determining whether a failure to conduct additional investigation is reckless. As the government notes, *Meling* rejected the defendant's argument that an affiant was reckless in failing to search county records for readily available information that would have damaged an informant's credibility. *Id*. at 1554. But the government omits an important factor in the Ninth Circuit's opinion. The court wrote that "the FBI relied on its rap sheet to provide up-to-date information on [the informant's] criminal history, *and until [the informant] became a suspect* the FBI had no reason to conduct a more thorough background check." *Id.* (emphasis added).

---

[1] It should be noted that the procedural posture of *Miller*, in which the court denied relief, is materially different than our case. In *Miller*, the defendant was appealing an order issued after the district court conducted a *Franks* hearing, meaning the question was whether the defendant had demonstrated a *Franks* violation by a preponderance of the evidence. *See Miller*, 753 F.2d 1475 at 1476-77. The same is true of *United States v. Martinez-Garcia*, 397 F.3d 1205, 1214-15 (9th Cir. 2005), another case relied upon by the government in which the court found no violation. Here, by contrast, the defendants must only make the "preliminary substantial showing" required to obtain a *Franks* hearing.

Here, of course, Co-Conspirator 1 *was* a suspect and had been for at least a year before the government began working with him. Haunold Decl. ¶¶ 4-6. Like the affiant in *Chesher*, SA Haunold had a long history of investigating the purported conspiracy and Co-Conspirator 1's central role in it—as a target, not a reliable informant. *Id.* And as in *Tanguay*, SA Haunold was faced with any number of red flags about Co-Conspirator 1's credibility. The government touts the affidavit's disclosure of Co-Conspirator 1's "potentially serious credibility issues" (Dkt. 151 (hereinafter "Opp.") at 25), but almost every aspect of that disclosure should have triggered a more thorough investigation of Co-Conspirator 1's background. SA Haunold knew Co-Conspirator 1 appeared to be seeking "revenge" against the Duongs, that he had "any number of other potential personal motivations" for his allegations, that he had been charged with fraud in connection with the very transaction in which he now sought to implicate the defendants, that he had previous arrests and charges for theft and embezzlement, that he had been investigated for money laundering, and that a police report from only a month before alleged he had defrauded a business partner of $250,000. Dkt. 120, Ex 1 (June 2024 Warrant Affidavit, hereinafter "Aff.") ¶ 30, n.2; Haunold Decl. ¶¶ 19-20. Case law demonstrates that, in light of what SA Haunold already knew, his failure to take the simple step of typing Co-Conspirator 1's name into online, public databases was reckless.

### B. SA Haunold was reckless in claiming the June 9 shooting was a targeted attack coordinated by the Duongs.

The same recklessness characterizes the affidavit's claim that "on June 9, 2024, Co-Conspirator 1 was the victim of a suspected targeted shooting due to his cooperation in this investigation." Aff. ¶ 30, n. 2; *id.* at ¶ 144 ("I believe that the shooting was targeted and may have been coordinated by the Duong family in an attempt to kill or harm Co-Conspirator 1 to prevent him from cooperating with the investigation."). The evidence available to SA Haunold at the time showed that the affidavit's version of events—that assailants were "waiting for Co-Conspirator 1 to return home and may have attempted to draw [him] out of his home before they opened fire," and that Co-Conspirator 1 did not initiate the shooting but only "returned fire"— was wrong. *Id.*

1     SA Haunold told the magistrate judge that the shooting was connected to this case for
2 two reasons: the shooting was a "targeted" attack on Co-Conspirator 1, and it came three days
3 after Co-Conspirator 1's first meeting with the FBI. Aff. ¶ 144. On the latter point, the
4 government does not dispute that SA Haunold had no reason to believe that the Duongs (or
5 anyone else) knew Co-Conspirator 1 had started cooperating with law enforcement shortly
6 before the shooting. In other words, SA Haunold had no evidence for one of the two reasons he
7 laid the shooting at the Duongs' feet.
8     The claim that the shooting was targeted is more complex, but just as unsound. The
9 government says the significance is "unclear" of the evidence, known by SA Haunold at the time
10 he submitted the affidavit, "that witnesses heard four initial shots, and the officers found 40
11 caliber casings on Co-Conspirator 1's front yard." Opp. at 21 n.6. In fact, the significance is
12 unmistakable: the evidence contradicts Co-Conspirator 1's claim that he did not initiate the
13 gunfire. Co-Conspirator 1 told police that unknown assailants fired twice at him, that he then
14 shot four times in self-defense, and that the assailants left and returned to fire again around ten
15 minutes later. Dkt. 120, Ex. 18 at 6. But witnesses agreed that the initial volley was only four
16 shots, not six, and investigators found four casings that matched Co-Conspirator 1's gun in Co-
17 Conspirator 1's front yard. Dkt. 120, Ex. 18 at 2, 6; Ex. 21 at 1. Thus, the available evidence
18 suggested that, in the initial round of gunfire, Co-Conspirator 1 shot four times and the supposed
19 assassin not at all.[2] That inconsistency should have alerted the affiant to the falsity of Co-
20 Conspirator 1's self-serving version of the shooting, which the affidavit recounts without
21 question.
22     The affidavit's version of events was also inconsistent with available evidence that
23 suggested a botched smash-and-grab robbery rather than a targeted attempt to kill an informant.
24 Witnesses told the FBI that Co-Conspirator 1's neighborhood was a high-crime area, that the

---

[2] This was corroborated by ShotSpotter reports, which documented four gunshots (not six) at 9:52 p.m. and nine additional shots at 10:07 p.m. As noted in the moving papers, it appears the government received these reports on June 15, 2024, but the affidavits in support of the rollover warrants, filed five days later, did not disclose the ShotSpotter reports and continued to allege that Co-Conspirator 1 fired only in self-defense.

suspects were known to the neighbors, and that the suspects had been observed hitting Co-Conspirator 1's car with a brick prior to the shooting. Dkt. 120, Ex. 19 at ¶¶ 1 and 4; Ex. 20 at ¶ 7. The government says SA Haunold had no obligation to present this evidence, because it did not "indicate[] that Co-Conspirator 1's account of the shooting was not true." Opp. at 22. But that is exactly what this evidence indicates: that this was a robbery gone wrong and not a targeted attack.

The affiant based his conclusion that the shooting was a targeted hit, in part, on his "training and experience." Aff. at ¶ 144. But SA Haunold's declaration does not claim that he or any of his colleagues have ever encountered a case where an alleged hit man, who was lying in wait, allowed his target to get into his house and arm himself before attempting to lure the target out by loudly breaking car windows, thereby drawing the attention of the entire neighborhood who could then witness the shooting. A far more likely scenario—and one that matches all the evidence SA Haunold had other than Co-Conspirator 1's statement—is that Co-Conspirator 1 fired the four unanswered shots at people who were breaking into his car.

The evidence available to SA Haunold was sufficient to raise serious doubts about Co-Conspirator 1's version of events. And SA Haunold knew Co-Conspirator 1 had a clear motive to lie about the shooting: if he fired first, he could face serious criminal charges and could not rely on an argument that he shot only in self-defense. It was reckless, at best, for the affidavit to recount a theory of the shooting provided by an obviously biased witness that was contradicted by the available evidence without at least telling the magistrate judge about the contradictory evidence.

**C. The omitted information was material to the affidavit's showing of probable cause as to David Duong.**

The government asserts that the affidavit's showing of probable cause would have been unaffected by inclusion of information about Co-Conspirator 1's history of fraud and of evidence showing Co-Conspirator 1 lied to police about the shooting. Opp. At 23. In support, it offers two arguments. The first is that the information itself is of little import, and the second is that the

affidavit's showing of probable cause is so robust that it would be unaffected by addition of the additional information. Both arguments fail.

Turning first to the significance of the information itself, the government dismisses Co-Conspirator 1's decades-long history of fraud as nothing but "stale civil allegations" (Opp. at 25) that could not have affected the magistrate judge's assessment of the affidavit. The government picks at the individual cases revealed in public records, quibbling in some instances that complaints were unsworn, that judgments against Co-Conspirator 1 were default judgments,[3] or that the allegations are old. Opp. at 17-18. But the government cannot refute the pattern that the omitted information reveals: one in which Co-Conspirator 1 has for decades been repeatedly accused of serious frauds, including by government licensing boards and by the City of Oakland, has been ordered to pay hundreds of thousands of dollars and to surrender his real estate license as a result of those frauds, and, perhaps most important, has repeatedly accused rivals of wrongdoing in efforts to deflect blame from himself. The information disclosed in the affidavit barely scratches the surface of the reasons a magistrate judge would have had to disbelieve Co-Conspirator 1.

As to the shooting, the government now attempts to downplay the significance of this event, claiming it was included in the warrant affidavit only to provide additional information "about the events, Co-Conspirator 1's state of mind, and potential motives for statements to law enforcement." Opp. at 22. This after-the-fact characterization cannot be squared with the application itself, which asserts "probable cause to believe that A. Duong and D. Duong have violated 18 U.S.C. 1512(a)" and explains that this statute applies where "the defendant killed or attempted to kill another person, with intent to prevent the attendance or testimony of any person in an official proceeding." Aff. at ¶¶ 2, 12. The shooting was not included to shed light on Co-

---

[3] In California, a judgment is a final determination of the rights of the parties in the action (Cal. Civ. Proc. Code § 577), and a default judgment constitutes "an express admission of the matters well-pleaded in the complaint." *Steven M. Garber & Assocs. v. Eskandarian*, 150 Cal. App. 4th 813, 823 (2007). Thus, Mr. Duong has submitted sufficient proof to establish that Co-Conspirator 1 had a long track record of defrauding prior business partners and had been found liable by courts for fraud—including claims for fraud & deceit and fraudulent concealment. Dkt. 120, Exs. 5, 7, 12, and 13.

Conspirator 1's state of mind. It was a cornerstone of the affidavit, an accusation of a serious, violent crime allegedly orchestrated by the Duongs that heightened the urgency to conduct the search of Mr. Duong's house. Had the magistrate judge known that this allegation was not only untrue but was just another of Co-Conspirator 1's lies, the judge's assessment of the affidavit would undoubtedly have been different.

In short, the omitted information undermines Co-Conspirator 1's credibility completely. Had the affidavit revealed that Co-Conspirator 1 fabricated the most serious and dramatic claim in the affidavit—that the Duongs tried to have him killed—and had it disclosed the extent to which Co-Conspirator 1's history is replete with fraud including false allegations against business partners, the claims that depend solely on Co-Conspirator 1's word would have carried no weight.

The argument that the affidavit establishes probable cause even if the omitted information is included fares no better. As an initial matter, the government cannot rely on SA Haunold's assertion that evidence from Co-Conspirator 1 was superfluous to a finding of probable cause. *E.g.*, Opp. at 1, 14, 27. It is the job of the courts, not law enforcement, to determine probable cause. *See Coolidge v. New Hampshire*, 403 U.S. 443, 450 (1971) (noting that the Fourth Amendment requires that probable cause determinations "be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime"). The Court should disregard the affidavit's self-serving assessment of its own showing.

More fundamentally, the government's opposition fails to meaningfully distinguish between defendants and thus fails to address the fact that allegations in the affidavit concerning David Duong's involvement in the alleged scheme are minimal when Co-Conspirator 1's statements are removed. As explained in the moving papers, the affidavit was based on two categories of information: documents (text messages, emails, and phone logs) and statements from Co-Conspirator 1. In attempting to show that the first category, standing alone, establishes probable cause as to David Duong, the government cites the few instances in which he is

mentioned or participates in a text exchange. Those isolated allegations—separately or taken together—do not show participation in any corrupt scheme.

The government points first to the exchange in which Andy Duong and Co-Conspirator 1 express surprise or concern that Jones was contacting David Duong instead of Co-Conspirator 1; during that exchange, Co-Conspirator 1 writes "I feel sure David will back us up." Opp. at 27. This may suggest that Co-Conspirator 1 hoped for David Duong's support, but it does not show that David Duong was aware of or participating in the alleged scheme. The government also notes evidence that David Duong was aware of Jones's contract with Evolutionary Homes and of payments to Jones. *Id.* The government calls these "corrupt payments," (*id.*) but no message that includes David Duong suggests that the payments were part of any corrupt scheme or that David Duong had reason to believe they were. The government also relies on the discussion between Co-Conspirator 1 and Andy Duong that includes Co-Conspirator 1's summary of the supposed deal. *Id.* But it fails to address what was pointed out in David Duong's moving papers: this exchange indicates that Co-Conspirator 1 understood David Duong was *not* aware of any plan—why else would he ask if David should be told about it? And Andy Duong's internally contradictory response (which appears to say both that they would share with David later and that they had already shared with David) cannot mean he had shared Co-Conspirator 1's summary with David "numerous times," since Co-Conspirator 1 created that document that same day. *See* Dkt. 119 (Motion) at 18.

Thus, the documentary evidence alone cannot establish probable cause to believe David Duong participated in any alleged scheme. The government's repeated insistence that Co-Conspirator 1's statements did no more than establish "context and completeness" for the documentary evidence is simply not true. Opp. at 1, 14, 27. Only Co-Conspirator 1 gave the government evidence that David Duong allegedly actually knew of or participated in any corruption. Co-Conspirator 1 claimed to have heard David discuss the supposed scheme in meetings—meetings where the only record is the word of Co-Conspirator 1. These claims were crucial to the showing of probable cause, and they were not corroborated by other information. While documentary evidence might show that David Duong was at a meeting, only Co-

Conspirator 1's word established what was purportedly discussed there. Stripped of Co-Conspirator 1's allegations—as the application must be once the evidence of his lack of credibility is considered—the affidavit fails to establish probable cause.[4]

### D. The affidavit fails to establish probable cause to search David Duong's house or car.

In response, the government attempts to shore up the affidavit's showing of a nexus between the house and criminal activity, but its efforts are unavailing. The government points out that the affidavit states that the defendants "received mail at their listed address," that their "vehicles [were] located at those addresses," and that cell phone data showed the phones were "at their residences in the days leading up to the search warrants." Opp. at 32. While these statements show that the defendants lived at their own homes, they say nothing about criminal activity. As Mr. Duong pointed out in his motion, and as the government does not contest, nothing in the affidavit suggests that any part of the alleged scheme took place either at Mr. Duong's home or in his car.

In the absence of any such showing, the government relies on the general proposition that "subjects in white-collar and fraud cases" keep belongings in their cars and homes, and thus police might find evidence there. Opp. at 33. This argument would undo the rule that "probable cause to believe that a suspect has committed a crime is not by itself adequate to secure a search warrant for the suspect's home." *United States v. Ramos*, 923 F.2d 1346, 1351 (9th Cir. 1991) (citations omitted), *overruled on other grounds by United States v. Ruiz*, 257 F.3d 1030 (9th Cir. 2001). Case law has long been consistent that a more persuasive showing is required to search a suspect's home. *Lange v. California*, 594 U.S. 295, 309-10 (2021) ("The zealous and frequent repetition of the adage that a 'man's house is his castle' made it abundantly clear that both in England and in the Colonies 'the freedom of one's house' was one of the most vital elements of

---

[4] The government notes that the defendants did not move to suppress the earlier warrants, which were issued before Co-Conspirator 1 began his cooperation. Opp. at 3. David Duong does not concede that those warrants were supported by probable cause. As to the June 2024 warrants, the *Leon* good faith doctrine does not apply because they are based on false or misleading information. *United States v. Leon*, 468 U.S. 897, 923 (1984).

English liberty.") (citations omitted); *Georgia v. Randolph*, 547 U.S. 103, 115 (2006) ("[I]t is beyond dispute that the home is entitled to special protection as the center of the private lives of our people[.]"). And as the moving papers noted, the boilerplate language justifying the search of a home here includes items—such as emails or text messages—that are not actually found in homes but would be located in the email and iCloud accounts the government had already obtained. *See* Dkt. 119, 21-22.

Because the affidavit relied on faulty boilerplate claims without reference to David Duong and the evidence in this investigation, it was "so lacking in indicia of probable cause" that no reasonable officer could have believed it valid.

### III. CONCLUSION

Based on the foregoing, David Duong has made the requisite initial substantial showing of recklessness disregard for the truth sufficient to set a *Franks* hearing. He requests that the Court do so and that the Court suppress the fruits of the search of his home.[5]

Dated: January 29, 2026

Respectfully submitted,

/s/
Edward W. Swanson
August Gugelmann
SWANSON & McNAMARA LLP

Neal J. Stephens
Jeffrey B. Schenk
Thao Donnelly
JONES DAY

Attorneys for David Duong

---

[5] Mr. Duong also moved to suppress fruits of the search of his cell phone on the grounds that the warrant affidavit did not set out probable cause to seize some of the requested information. The government responds that the information at issue is not subject to suppression under case law and the Stored Communications Act. Opp., 35-36. While it remains true that the warrant affidavits did not describe a basis for seizing this information, Mr. Duong agrees that suppression is not an available remedy.