# EXHIBIT 3

**Pages 1 - 48**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge Presiding

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
VS. ) **Case No. 4:25-cr-00003-YGR**
)
SHENG THAO, et al., )
)
Defendants. )
)

Oakland, California
Monday, October 5, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
CRAIG H. MISSAKIAN
United States Attorney
1301 Clay Street - Suite 340S
Oakland, California 94612
**BY: MOLLY PRIEDEMAN**
**ABRAHAM FINE**
**LLOYD A. FARNHAM**
**ASSISTANT UNITED STATES ATTORNEYS**

For Defendant Sheng Thao:
DLA PIPER LLP
555 Mission Street, Suite 2400
San Francisco, California 94105
**BY: JEFFREY E. TSAI**
**ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Stenographically Reported BY:
Kelly Shainline, CSR No. 13476, RPR, CRR
Official Reporter

**APPEARANCES**: (CONTINUED)

For Defendant Andre Jones:

LAW OFFICES OF SHAWN HALBERT
217 Leidesdorff Street, Suite 340
San Francisco, California 94103
**BY: SHAWN HALBERT**
**ATTORNEY AT LAW**

For Defendant David Trung Duong:

SWANSON & MCNAMARA
300 Montgomery Street, Suite 1100
San Francisco, California 94104
**BY: AUGUST P. GUGELMANN**
**ATTORNEYS AT LAW**

For Defendant Andy Hung Duong:

COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105
**BY: WILLIAM D. SPRAGUE**
**BRYANNA WALKER**
**ATTORNEYS AT LAW**

**Monday - October 5, 2026** **9:32 a.m.**

**P R O C E E D I N G S**

**---000---**

**THE COURTROOM DEPUTY:** Calling the Criminal matters 25-cr-3-YGR-1, -2, -3, and -4, United States of America vs. Sheng Thao, Andre Jones, David Trung Duong, and Andy Hung Duong.

Parties to state your appearances for the record, starting with the Government.

**MR. FARNHAM:** Good morning, Your Honor. Lloyd Farnham, Molly Priedeman, and Abraham Fine on behalf of the United States.

**THE COURT:** Good morning.

**MR. TSAI:** Good morning, Your Honor. Jeffrey Tsai for defendant Sheng Thao who, with the Court's permission, is not present in the court.

**THE COURT:** Good morning.

**MS. HALBERT:** Good morning, Your Honor. Shawn Halbert on behalf of Andre Jones, whose appearance has been waived.

**THE COURT:** Good morning.

**MR. GUGELMANN:** Good morning, Your Honor. August Gugelmann for Mr. David Duong, whose appearance has also been waived.

**THE COURT:** Good morning.

**MR. SPRAGUE:** Good morning, Your Honor. Doug Sprague

on behalf of defendant Andy Duong, whose appearance also has been waived, and also Bryanna Walker on behalf of Andy Duong.

**THE COURT:** Good morning.

All right. Where do we stand? I saw the memo that was sent yesterday and I read that. Mr. Farnham?

**MR. FARNHAM:** Thank you, Your Honor.

So I'll start. We all worked all weekend on this. Molly Priedeman and Abraham Fine will chime in with other information as we need it, but I thought I would start and describe what we worked on and what we did to try to address this issue.

The -- at the bottom -- the bottom line was that certain materials had not been reviewed by case agents to determine either scope and relevancy under the -- well, they had not been reviewed to determine whether they were truly privileged rather than hit on potentially privilege terms, and then we hadn't done the scoping and relevancy review that would come after those were released to the case team.

So we took steps to address those issues, and we did a few things. First of all, we did identify all the accounts where this was made at issue. After the hearing on October 1st, just a few minutes after that hearing, we did identify to the Defense counsel what we were talking about.

And what we are talking about is a Mario Juarez e-mail account we obtained from Microsoft; the Mario Juarez iCloud account, in particular one of the two warrants we got for that

iCloud account; a search warrant for the iCloud of an Oakland East Bay politician that we should not identify in court, is my view, because that person has not been charged or accused with a crime and that warrant is not public; and then warrants on the residence of Bryan Azevedo where we obtained devices from him and searched those pursuant to the warrant.

So different -- there are a little bit different postures and different contexts for all those things.

**THE COURT:** And can I just interrupt --

**MR. FARNHAM:** Yes.

**THE COURT:** -- with respect to Footnote 1?

I see that you sent the letter which made the identification to the lawyers. I take it that all of the lawyers understand that that's a confidential document and they are not sharing that information and they're not disclosing that information; correct?

**MR. SPRAGUE:** That's correct on behalf of counsel for Andy Duong.

**THE COURT:** And under your protocols, can they disclose that to their clients and do their clients understand that that's not disclosable information?

**MR. GUGELMANN:** Yes, Your Honor. So my understanding, the Government can correct me -- August Gugelmann for David Duong -- that search warrant, as all the rest of the discovery that we've gotten, was obtained -- was given to us by the

Government pursuant to the protective order in this case. That limits who we can share information with. It allows us to provide to show information to our clients but not give our information to our clients. It allows us to share. You know, for example, if that person were someone that we considered a witness who had relevant information, the protective order would allow us to share information about that search warrant with the witness or that person's counsel.

But, yes, our understanding is that search warrant is subject to the same protections as the rest of the discovery in this case.

**THE COURT:** Agreed?

**MS. HALBERT:** Yes, agreed on behalf of Mr. Jones.

**THE COURT:** Agreed?

**MR. TSAI:** On behalf of Defendant Thao, yes, that's how we've been treating this consistent with the protective order, Your Honor.

**THE COURT:** All right. Keep going.

**MR. FARNHAM:** Thank you, Your Honor.

So that was the sort of universe of items.

Just as a side note, the -- some of the other search warrants that involved the defendants' devices, of course the privileged assertions were litigated by a protocol that Your Honor had presided over. None of that is an issue here. What we're talking about is the items and the search warrants

that I just referenced.

What we proposed to -- just a little bit of a timeline. What we proposed later on October 1st was a couple things. One, for the -- for the East Bay politician, Bryan Azevedo -- excuse me -- and I believe for the Mario Juarez iCloud, I'll confirm that in a moment, what we proposed to the Defense was that we use some relevancy search terms prior to the renewed privilege determination. That way it narrowed the scope of possible documents that we should review for privilege, and then -- and would allow us to complete a reasonable search for those materials and a reasonable relevancy determination on a reasonable scope that would be more limited.

And for those, we did propose search terms to Defense counsel, they added some terms, and then the letter reflects our best effort to incorporate all the search terms for the various different parties that the Defense -- that the Defense wanted.

And so what we did for the politician and for Azevedo, is that essentially in most cases we ran those relevancy terms against the potentially privileged set, had our filter team look at everything that resulted to determine whether or not it was really privileged; and then if it was not, release it to the case team to determine whether or not it fit within the warrant or was *Brady* or had other exculpatory information.

To anticipate a question I know Mr. Sprague will ask about

a privilege log, we do intend today to have the filter team send to the Defense counsel a log of everything that has been -- that we say is privileged and is being -- was withheld from the case team but also we say should be withheld from Defense counsel. So we'll provide that shortly.

And that's going to be across the board. We will have a log listing all the documents that we think that there is privilege over. We'll disclose that to Defense.

For the East Bay politician, for the Azevedo devices, we have now produced a -- case reports for some additional -- small amount of additional items that we provided to the Defense and that resulted from this process, filter team taking a look at what was in that potentially privilege bucket, and then case agents looking at it for relevancy, scoping, and exculpatory information. And then that was released -- we produced that late last night in the form of these extraction reports that come from electronic devices.

We also produced the Mario Juarez iCloud in that same way. So we produced the extraction report that had some additional items for the Mario Juarez iCloud.

One thing that's important to note for that, we got two warrants for Mario Juarez's iCloud separated by time. The first one in February -- excuse me -- July 2024 -- '23, the first one in July 2023, the second one in February 2024.

The first warrant was done without a filter process which

is common when we execute search warrants when it's early in our investigation. We didn't see additional -- we didn't identify any obvious privilege stuff when it was being reviewed and the case agents did a full relevancy and scoping review of that, and that is the seized material that has been also produced to the Defense counsel.

So in terms of Mario Juarez's iCloud data prior to -- prior to July 2023 -- excuse me -- July 2024 -- July 2023, there's not this filter -- potentially privileged filter issue doesn't apply. We didn't do that -- we didn't do that potentially privileged cut on those.

So the e-mail, Mario Juarez's e-mail, is a little bit of a separate issue that was a little bit trickier, and so I might pause there and see if Your Honor has any questions and --

**THE COURT:** Could you tell me, because I didn't do the math -- go ahead.

**MR. FARNHAM:** I'm sorry, Your Honor.

**THE COURT:** I said could you tell me, because I didn't do the math, what -- how many documents were then produced? Because it said, you know, a bunch of these -- the remainder were then released to the case team. Have they been produced to the defendants?

**MR. FARNHAM:** Yes, they have. So the case agents did do a review for relevancy, as I think they're required to do under the warrant. So what was produced to the Defense is a

smaller number --

**THE COURT:** Right.

**MR. FARNHAM:** -- but I don't have those numbers off the top of my head. We'd have to look back at the reports for those.

**THE COURT:** Well, wasn't that done like this weekend?

**MR. FARNHAM:** It was all done this weekend.

**THE COURT:** Okay. Is there no one in the audience who can tell me that information?

**MR. FARNHAM:** The approximate number of documents across the reports, not including Mario Juarez's e-mail, which we'll talk about in a minute, but that's --

**THE COURT:** That's --

**MR. FARNHAM:** -- essentially six other -- six other items -- Mario Juarez's second iCloud, East Bay politician's iCloud, four Bryan Azevedo devices -- was about 850, 860 is a ballpark number of data items/documents that were released to the case team -- excuse me -- released -- they were produced to the defendant after being identified as relevant by the case team.

**THE COURT:** Okay. And then Mario Juarez's first iCloud, what about there?

**MR. FARNHAM:** Well, Your Honor, that -- as I mentioned, that one did not go through a filter protocol that involved a potentially privileged cut.

**THE COURT:** So that's already been produced?

**MR. FARNHAM:** Yes.

**THE COURT:** All right. So that's fine.

**MR. FARNHAM:** Years ago.

**THE COURT:** And when you say "data items," that could be e-mails, videos, photos; is that what you -- I mean, I want to understand what you mean by the term "data items."

**MR. FARNHAM:** Sure. That's going to include things, and I'll let Ms. Priedeman fill in after I give this list, but it's going to include -- it could include e-mails. It could include photos, although I don't know offhand if any were actually flagged in that because -- I doubt it. I think they were originally manually. They wouldn't have hit search terms.

It could be text messages and the way that a potentially privileged search would work in the review platforms that they use is it would have identified individual messages but not a whole chain. So it would be literally individual messages or a couple, two, three messages that might be -- might have been hit with those search -- with those potentially privileged search terms. So it might be text messages. It might be -- it might be calendar items.

**THE COURT:** Okay.

**MR. FARNHAM:** There might -- Ms. Priedeman says there might be videos in there, but that's only because we would have reproduced a text chain that had a few things withheld and that

text chain might have had some video attachments. So they may also be in the data items, but it's likely that those were already flagged and produced in the original reports provided to Defense.

**THE COURT:** Okay. Mr. Sprague, you're at the mic.

**MR. SPRAGUE:** Your Honor, I'm still not clear on what is still -- I'm relatively clear on what has gone on to date and the letter we got at 10:00 o'clock last night explained some of this, but I'm not clear on what is still ongoing because I think the letter we got at 10:00 o'clock last night said there's still more to be done and more coming. That's what I'm not clear about.

**THE COURT:** Oh. Other than the privilege log, what is left?

**MR. FARNHAM:** So Mario Juarez's e-mail account, that is -- that was obtained from Microsoft cloud provider pursuant to a search warrant. That -- so the potentially privileged bucket for that, those search terms hit about 11,000 e-mails, comes out to about 14,000 documents when you include the attachments to those e-mails. So about 14,000 items from that Microsoft account were in the potentially privileged bucket.

Here's what we did with those: So we provided those -- that bucket to Mario Juarez's counsel to do a privilege review. That was not done on a relevancy -- like, we did not limit it for relevancy first. They were asked to review all of those

and determine what were really privileged in that set. They have done that. That's about 288 documents. It may be more with attachments, but essentially it's 288 things that they are going to assert privilege over.

The remainder of those documents, the question is what to do with those. Our proposal is to run the search terms that Defense counsel have provided. I will note that they -- if you look at the letter, the Mario Juarez search terms, there's some 200 of them, they are very broad. They will hit a large number of items, but our proposal is to run those search terms and then provide that -- what hits on those to Defense counsel.

The other thing that Mario Juarez's counsel did, he's represented by Paul Weiss, they had a tool that identified newsletters and mass e-mails. So there's a bucket of approximately 9,000 of those 14,000 documents that are newsletters and mass e-mails. I have looked at that database. It does, indeed, look like all of those are mailing list newsletter items, junk mail but also newsletters, you know, when you sign up for e-mail notifications.

So there's that set that we don't think is relevant, but interested to hear about what the Defense would like to do with those.

Then there's approximately 4,000 that are not newsletters that -- and also are not privileged, and our proposal --

**THE COURT:** So I have -- I'm missing a thousand

somewhere. We started with 14,000, 9,000 of those are these newsletters, mass e-mails, and junk e-mail, which leaves 5,000. And so you're saying now of the 5,000, there's 4,000.

**MR. FARNHAM:** The -- so I'll give you the numbers that are in the two databases that we have. So the database that is the newsletters and junk e-mail is 9,160 documents approximately. The database that includes not those and also not privileged is 4,266. The -- there are 288 items on the log that Paul Weiss provided us that they are asserting privilege over. So it doesn't quite add up to 14,000 but it's close. But those are the three sets that we have now.

So a couple things are going to happen now in our proposal. One is our filter AUSA and our filter team is going to assess the Paul Weiss assertions of privilege and independently assess those from our perspective. We also will provide the log to the Defense counsel and they can weigh in on those assertions as well. But it's to figure out the contours of the privilege assertion and make sure those are appropriate. That, of course, is going to -- the debate about those is going to affect likely a handful of documents, if any.

The remaining, I think the most -- the most -- the priority set then is that second set, 4,200 and something, that are not privileged and not newsletters and that were from Mario Juarez's iCloud -- excuse me -- e-mail, questions what to do with that.

Like I said, when we had talked about this process on October 1st with the Defense, we said we plan to run relevancy search terms before we do the privilege review, and those are the terms we provided. They suggested a bunch more terms for Mario Juarez, and that's the list that Your Honor sees in that letter.

We actually ended up, like I said, telling Paul Weiss they don't get to search for relevancy. They need to do a privilege review of every document, and that's what they've done. They've made their privilege assertions. It did not -- it was not on a relevancy-limited set.

So now we're set -- now we're left with how do we provide the relevant documents, and there are a few options here. One is for us to run the defendants' proposed search terms. Like I said, looking at that last night, I mean, that could hit as many as 2900 out of the 4,266. So search terms that include things like "general" and "donate," they're obviously a little bit overbroad but they would hit a lot of documents. But that's one option that we could do to provide them but in the quickest way their view of what they think might be relevant. And then, of course, they can run more narrow search terms as they see fit in that. So that's one option, and that's what we would propose.

We do want -- there are some medical -- some particular medical issues that Mr. Juarez was dealing with. We don't

think that those are relevant to anything here and certainly not responsive to the search warrant, and he has a privacy interest in those. We would like to run some terms that he tells us about his medical conditions and try to cut those out. We think that's appropriate. That's going to be a small number and shouldn't have any effect on the Defense getting anything that's relevant here.

**THE COURT:** Okay.

**MR. SPRAGUE:** Thank you, Your Honor.

Well, I do think -- starting here toward the end, I do think that the Government should run the proposed search terms that the Defense sent over in response to the Government's initial draft search terms, which the Defense believed was far too limited, to say the least. So I do think they should run those. If there's 2900 documents, then they should run those and they should produce those.

As for the medical issues for Mario Juarez not being relevant, I would definitely disagree with that in a vacuum. I don't know what the date of it is. If it's immediately after May 3rd, it could absolutely be relevant. It could be relevant in many other times in the case too and it would be covered by the same thing that Footnote 1 is covered by. Particularly given the timing that we're facing now, I think that should be included, not withheld.

**THE COURT:** How is it relevant?

**MR. SPRAGUE:** Well, there's --

**THE COURT:** Let's say, God forbid, someone's got cancer, how is that relevant?

**MR. SPRAGUE:** That wouldn't be. That wouldn't be.

**THE COURT:** Okay. Well, then how is it relevant?

**MR. SPRAGUE:** Well, but there's other things that could be. I don't know what --

**THE COURT:** Like what?

**MR. SPRAGUE:** I don't know what they are.

**THE COURT:** Give me an example.

**MR. SPRAGUE:** After May 3rd, he, we think, made up medical issues or overstated -- greatly overstated any medical issues around May 3rd. I don't know if --

**THE COURT:** So beginning on May 3rd, you think that it's relevant. And so let's say he did make it up. So, again, how is that relevant?

**MR. SPRAGUE:** If he overstated any alleged injuries to the police after what he claims was a physical altercation on May 3rd, I think that would go to credibility.

I also think there could -- who knows -- I don't know what's in there. There could be mental state issues around key times in this case. In a vacuum, I can't just say that none of these medical records, not knowing what they would be, would not be relevant. I think they could be. Of course, I agree if someone has something like cancer, that's not -- that can be

screened out. Or a risk of cancer.

**MR. FARNHAM:** No dispute that May 3rd related medical issues would be relevant to this case and would be produced and provided if those are in there.

As to other ones, that's an issue that case agent -- the case agents and the case team, we should be allowed to make that determination. If it's exculpatory, if it relates to the issues in this case, we'll provide it; but if it's an unrelated medical issue, it's not responsive to the warrant.

**MR. SPRAGUE:** And I would ask, Your Honor, that if that's the process, that the Government can do that, that that also be logged by way of like a priv log or a set that --

**THE COURT:** Under what law?

**MR. SPRAGUE:** I'm sorry?

**THE COURT:** Under what law?

**MR. SPRAGUE:** I don't know what law that would be, Your Honor. I don't know. I couldn't cite a law for a privilege log either, but I think that should be --

**THE COURT:** Well, privilege is a concept that I'm quite familiar with as are you. The other -- you've given one example and I'm trying to get you relevant documents; and if they're not relevant, they're not relevant. We're not going to log everything that's not relevant.

**MR. SPRAGUE:** And I agree. I don't mean a list of like -- like a priv log list.

**THE COURT:** What else is there?

**MR. SPRAGUE:** I think they should be segregated, and so we should -- the Defense should know the Government withheld X documents based on the witness' medical.

**THE COURT:** Phones have people's lives in them, what used to be rooms full of documents. Everything on someone's phone is not necessarily relevant, and we are not going to get in a pattern and practice of logging irrelevant documents.

What else do you have?

**MR. SPRAGUE:** On their list, well, the -- I think I understand the plan going forward. There's still the math doesn't add up to the number we saw in the letter last night, but presumably the Government can explain that to us. Not going through all the math today, we don't need that, but I do think we have a plan going forward for this set of documents that's been identified in the last few days.

What remains a serious concern, at least for -- on behalf of Andy Duong, is this has raised issues with what the Government did back in the summer of 2024 when the Government wrote us in connection with this process that there's no obligation to run search terms. We don't know what they did back in 2024.

**THE COURT:** What relief are you asking for, Mr. Sprague, other than trying to pepper the transcript with problems?

**MR. SPRAGUE:** I'm not trying to pepper the transcript with problems, Your Honor. This is absolutely legitimate. Am I trying to make a record of this? Absolutely. This is a legitimate concern from the Defense.

**THE COURT:** Okay. So what relief are you asking for?

**MR. SPRAGUE:** I don't have it right now because I can't understand where -- what they did before.

**THE COURT:** But what are you asking for?

**MR. SPRAGUE:** I'm just stating that we're concerned with it and we're going to continue to evaluate that as we evaluate the letter we got last night at 9:55 p.m. and what the Government has told us today and in the documents that we're getting, I don't know, today or tomorrow.

**THE COURT:** Okay. So what do you want me to do?

**MR. SPRAGUE:** Nothing with respect to that issue. As I said, I think with this set of documents I think we -- it sounds like, from what Mr. Farnham said, we have a plan in short order.

**THE COURT:** Okay. So we have a plan. We're moving forward with a plan. You're not asking for any relief.

**MR. GUGELMANN:** Your Honor, there is one thing that I would like to propose for the Court's discussion as it relates to this issue.

So taking the Mario Juarez e-mails as an example, what the Government has said is there were 200,000 e-mails seized, I

think they say in their letter, in this one account. To use slightly easier figures, 15,000 of those were screened out for privilege. Those are the ones we've been talking about today. I think it's 14,000-something but call it 15,000 just to make our lives a little easier. That leaves 185,000 e-mails that were seized that are outside of what we are discussing today.

What the Defense -- the concern the Defense has is that what we've learned since Friday is that the Government does not, as Mr. Sprague says, view that there's any obligation to run search terms against those 185,000 Mario e-mails, Mario Juarez e-mails, and so we don't --

**THE COURT:** I'm not following you. What 185,000 are we talking about?

**MR. GUGELMANN:** So what we under --

**THE COURT:** From which device?

**MR. GUGELMANN:** From --

**THE COURT:** I had four -- six devices and --

**MR. GUGELMANN:** This is --

**THE COURT:** -- the problem that was raised and that -- where I ordered them to work all weekend to try to get -- to get resolution on this topic was a set of e-mails that were -- or a set of data that had been segregated, and then no one went back to double check them.

**MR. GUGELMANN:** Correct.

**THE COURT:** That was -- that's what I thought we were

talking about.

**MR. GUGELMANN:** That is what brings us here today, but in the course of our discussions about that, this other issue has come up.

So let me -- just to be as clear as I can with the Court about what we're talking about, I'm referring to the letter that the Government provided a courtesy copy to the Court of the letter from last night, and on page 2 of that letter is the discussion of the Mario Juarez e-mail from Microsoft. So we're talking only about that section of these seven devices, the Mario Juarez e-mails.

**THE COURT:** All right. I'm with you now.

**MR. GUGELMANN:** Okay.

**THE COURT:** Go ahead.

**MR. GUGELMANN:** What the Government says there is, "We seized 200,000 e-mails from that account. We ran our privilege review, our privilege screen, and segregated out 15,000 e-mails roughly, 14,485." Those, call it, 15,000 e-mails are what we've been talking about here this morning. What happened with those? Why weren't they reviewed? What's the process going forward?

In the course of those discussions about how to handle those 15,000 e-mails, the Defense learned what Mr. Sprague was just describing, which is the Government said, "We don't have any obligation to run search terms against material that we

seize."

We also got from the Government their proposed list of search terms --

**THE COURT:** Hold on. I didn't hear them say that. Is that what you are suggesting?

**MR. FARNHAM:** No -- well, I don't quite understand the context of the question. Let's talk about e-mails for a second.

So when we were reviewing -- when the case team was reviewing e-mails to determine what was responsive to the warrant, yes, search terms were used. Now, is there an obligation to only do that or to do specific ones? We don't think there is an obligation for that. Our obligation is to the warrant and to the Court to find the relevant materials within the scope of the warrant, and we did that using various tools, including search terms for the e-mails.

**THE COURT:** For the 200,000?

**MR. FARNHAM:** Yes.

**THE COURT:** That's what I thought.

**MR. GUGELMANN:** Okay.

**THE COURT:** So why do you say that they didn't do that?

**MR. GUGELMANN:** So I'm not saying they didn't do that. I'm saying --

**THE COURT:** No, you actually did. That's why I

stopped him --

**MR. GUGELMANN:** No.

**THE COURT:** Or stopped you.

**MR. GUGELMANN:** What I was saying, Your Honor, is the Government said, "We don't have an obligation to run search terms," which I understand is slightly different. And what they're saying now is, "We did run search terms and we did other things."

We got from the Government a list of their proposed search terms to deal with the 15,000 that we've been talking about today. It was extraordinarily narrow. It didn't include the word "bribe." It didn't include "Gallegos," for example, someone we know is central to this case.

I understand the Government believes that the ones that the Defense proposed are overbroad in some respects, but we have real concern now that the review of those 200,000, based on the search terms that they provided to us, was really constricted and may have left a lot of relevant documents behind.

That's the issue that -- one proposal that the Defense would have, I think, is to run this set of search terms that we have now agreed on for the 15,000 against the broader set, against the 200,000.

So I'll pause there and make sure the Court's following the concern that we're raising.

**THE COURT:** Oh, I'm following.

The Government's search terms I understand are Exhibit B to the letter?

**MR. FARNHAM:** Exhibit B relates to East Bay politician search terms that we proposed.

**THE COURT:** And then is it Exhibit C.

**MR. FARNHAM:** Exhibit C is the search terms for Bryan Azevedo's devices that we have --

**THE COURT:** Do I have your original in terms of A?

**MR. FARNHAM:** You don't, Your Honor, and let me explain why. That -- so we got a search warrant for Mario's -- Mario Juarez's e-mail that allowed us to seize certain things. We did steps to try to effectuate that in the best way we could.

Every agent who was reviewing materials, by the way, was also instructed to look for and identify exculpatory information if appropriate, even if it was hard to see whether it was exactly responsive under the warrant. So that direction was given to every case agent who was doing reviews.

But when we reviewed the e-mails, the way it was done is, of course, it's a large volume, it was done -- search terms were used but also date ranges, specific time frames were focused in on. When financial documents would have been identified, there was an effort to identify all the financial documents, things like that.

Now, I'm not -- we were not tasked with going back and redoing the warrant, and I don't think that's on the table. We did the warrant. We executed the warrant. We identified materials that were responsive to the warrant that we could seize, that the court order allowed us to seize, and then we seized those and provided those to Defense. That was more than 4,000 e-mails out of Mario Juarez's e-mail account from that initial review.

How that review is done I don't think is at issue here. I'm not sure why that's being opened up again. That warrant was executed and seized pursuant to the authority we had from the magistrate judge.

**THE COURT:** And this is a -- this is a warrant from when? What was the date of the warrant?

**MR. FARNHAM:** May of 2024 issued to Microsoft for the e-mails stored in the cloud in a Mario Juarez e-mail account.

And I want to note, like, I -- we have not done a full investigation of how the review was done back to respond to that warrant, and I don't think it's warranted and not called for by this potentially privilege issue that Your Honor ordered us to deal with. That was the original execution of the warrant and we did our job in that regard.

**MR. GUGELMANN:** Your Honor, I think we've identified in Exhibit A that the search terms 1 through --

**THE COURT:** I'm just trying to see here if there's an

issue here or not. That is, at the time the warrant was issued there was no Indictment; correct?

**MR. FARNHAM:** Correct.

**THE COURT:** And the investigation -- and the Grand Jury, you hadn't -- had you done anything in front of the grand jury?

**MR. FARNHAM:** No, we had not.

**THE COURT:** So in May of 2024 it's an investigation.

**MR. FARNHAM:** Correct.

**THE COURT:** And just because there's an investigation doesn't mean that that leads to anything. So you've got to have probable cause to get a magistrate judge to issue a warrant, which the magistrate judge did for specific things.

So the magistrate judge then authorizes you to have a -- authorizes you to seize phones or accounts for very specific purposes. And under the warrant, you don't have authority to go beyond those purposes; correct?

**MR. FARNHAM:** That's correct.

**THE COURT:** So the mere fact that you have information or the account doesn't give you access to everything, it only gives you access to what's authorized under the warrant; right?

**MR. FARNHAM:** That's correct.

**THE COURT:** Are you suggesting then, Mr. Gugelmann, that they should be rereviewing -- are you switching up on me?

**MS. HALBERT:** Yes, because I did communicate with the

Government.

**THE COURT:** Are you suggesting that the Government needs to go -- are you suggesting they need to go beyond the scope of the authorized warrant just because they happen to have it in their possession?

**MS. HALBERT:** So there are two reasons why the answer is yes. The first is that -- and the reason why this issue is arising now is that the Defense was very surprised to see how limited the search terms were that the Government considered to be relevant.

And so if the Court looks at Exhibit A, it's 1 through 34 -- 34 or 37 -- 35 with the exception that we added "Michael," "Chris," and "Cecy." And so what this told us was that the Government's relevancy review did not include terms like "mayor," "Larry Gallegos," "Harold Duffy" -- these are all people who were supposedly part of the scheme or were pressured -- the housing community development office --

**THE COURT:** So don't you think that when the Government is trying to investigate a potential crime, they're trying to get everything possible that is relevant to investigate that crime?

**MS. HALBERT:** I would have thought that except for the list that they provided to us. So they give the example of "general," but that's an inappropriate word to look for. It's overbroad.

My client, Andre Jones, who supposedly was given a no-show job, gave a tour to Brigadier General Cross of the units. He was not anything to do with Oakland. He was a client, a potential client, of Evolutionary Homes.

**THE COURT:** So what you're arguing is that the Government hasn't been zealous enough in their attempt to get information from these devices.

**MS. HALBERT:** Your Honor, I think what's important --

**THE COURT:** Am I understanding this right?

**MS. HALBERT:** We don't know because I will tell the Court that when we asked why there weren't words like Government witness names, people who were supposedly being influenced or bribed, the Government's response was, "We did not use a specific set of search terms. We just used terms and topics."

If you look at the U.S. Attorney's manual, it specifically states that the U.S. Attorney's Office has an obligation to review material received, including via searches or search warrants, and it states in two different places, this is Section 9-5 of the U.S. Attorney's manual --

**THE COURT:** And do I have that in front of me? Probably not.

**MS. HALBERT:** No, but I can pass it up and I've tabbed both places.

It basically says that --

**MR. FARNHAM:** If I could see that too.

**MS. HALBERT:** Yeah. The U.S. Attorney's manual?

**THE COURT:** Yeah, he doesn't have that right in front of him. And why would you talk to him in my courtroom?

**MS. HALBERT:** You're right. You're right.

Your Honor, I'm going to represent as an officer of the court that the U.S. Attorney's manual requires the Government to review material that it subpoenas; and if there is any doubt that it can conduct an adequate review, it should provide the materials to the Defense.

This doesn't have to be about whether they did something wrong in the past. This is about whether the Defense currently has materials that it needs to adequately cross-examine Mario Juarez.

The Government has provided no explanation for why it would only include 35 terms or 34 terms and not include all of these things, and it asks us and the Court to trust that it did an adequate review before.

And I guess the other thing is the Government physically possesses those e-mails, and so the Court does not have to find that the Government did anything wrong but it can find that -- the Government represented to us over the weekend that they did not use a specific set of search terms.

I then asked -- I said I wanted to meet and confer, and I did not get an answer to this: Are we to understand that

agents made individual decisions to employ various reviews but there were no agreed-upon parameters or requirements or search terms? Is there any record of what terms were used?

And we asked: Do you know if "Gallegos," "EWD," "Duffy," do you know if they were searched? And we didn't get an answer.

So I think that what the Government has said is that Mr. Juarez's attorneys have a program that can eliminate junk -- junk mail. Presumably there are e-mails that fall out of the time zone. All we are proposing is that we make sure that certain terms were searched because the Government cannot provide any assurance about what has been searched. It says it did not have a -- it literally said, "We did not use a limited set of search terms."

**THE COURT:** Why did you say that?

**MR. FARNHAM:** Because it's true. It's a process. It was iterative. Search terms were used by the reviewing agents but they were not the only tool. Like I just mentioned, there are other ways that you can try to identify the relevant materials.

The warrant, for example, talks about sort of some broad subject matters that are pretty broad here, including Evolutionary Homes, everything related to ABC Security, everything about the 2022 Oakland mayoral election. Those are not defined by specific search terms, those are subject

matters, and agents used their best efforts to try to identify things that fall within that warrant as compelled by the order and the Constitution.

So when -- so we didn't use a specific set of search terms. That was not the issue that was being debated over the weekend. We were obviously a little busy, and we're sorry we didn't get back to Ms. Halbert about that, but that was not the issue before us here.

We did the steps we needed to, consistent with any obligation in the U.S. Attorney's manual or otherwise, to find the relevant materials in that set of e-mails and provide them in a meaning -- timely and meaningful way both to the investigative teams, who were, as you mentioned, investigating a crime, and then later to the Defense when the time came to turn over the materials that we discovered in the investigation.

But to suggest that there's any -- first of all, there's any authority for us to go back on the materials that have not been seized pursuant to a warrant and for which the order says they're actually sealed, I don't see any authority for us to go back to do that when there's just speculation that they think there might be something that we missed. I guess to put a fine point on it, I think that's what we're hearing. That's not a justification to go back and redo a warrant that we all complied -- we did in compliance with our obligations.

**THE COURT:** So authority?

**MS. HALBERT:** It's not -- it's not speculative because when the Government said they were going to search this new tranche of --

**THE COURT:** Did you hear my question? Maybe you didn't hear it. Maybe I need to speak louder.

**MS. HALBERT:** Your Honor, I heard the question.

**THE COURT:** Do you -- Ms. Halbert, I am trying to understand how I'm supposed to resolve your dispute and in order to do that, I actually need to know what the law is, not just what it is you want.

**MS. HALBERT:** So --

**THE COURT:** Do you have some authority that I can look at that says -- like, for instance, that says that they need to go back to a prior time when they're not in an investigative mode and rereview everything now that they know everything that they have to know because it was seized even though all those materials weren't necessarily seized under the warrant as they understood it?

It's not as if in May of 2024, they were trying to be limited in their attempt to get information to determine whether or not a crime had been committed. That's not their motive. Their motive is to be very broad based and yet, you know, many of these things are overlapping.

**MS. HALBERT:** So the authority I would cite to would

be Rule 16, the Government's ongoing requirement that it provide material evidence.

**THE COURT:** Okay. But let's talk about it.

It's not in their possession; right? It's not in their possession if they didn't think that it was in the scope of the warrant in the first instance. Or is it in their possession? Is there any law that explains that to me?

**MS. HALBERT:** Your Honor, the -- I do need to go back to the word "speculative" because the reason this issue is coming up now is that when the Government -- the Government did not say, "We will review these e-mails using the same criteria we used to review the other 185,000 e-mails." It said, "Here's what we propose," and it gave a paltry list that didn't include major people.

**THE COURT:** Well, it gave the list that they used, I thought, among the things that they used when they were investigating.

**MS. HALBERT:** But, Your Honor, that would mean that Mario Juarez's e-mails were not searched for terms like "mayor," "Larry Gallegos," the person who supposedly was the plant within Sheng Thao's administration to do the --

**THE COURT:** Okay. So that's why I'm asking the question. If at the time the warrant was issued they did a search of what they thought was relevant and they seized what was relevant and, therefore, did not seize anything else

because they didn't think it was relevant, what is the authority that says you should go back -- I mean, do they have to get a new warrant? And the reason I ask that -- I'm not asking this just to be difficult here. They didn't think it was part of the warrant at the time and so, technically speaking, they did not seize it.

**MS. HALBERT:** I think the Court -- I think it's -- I think there's an assumption about what they did. The truth is we don't know what they did. They've told the Court it was iterative, meaning they've gone back a number of times. I don't think the Government is saying that they did one review in March of 2024; but even --

**THE COURT:** Well, the warrant wasn't issued until May.

**MS. HALBERT:** Excuse me, May of 2024 -- well, I think there were -- that's right, there were different e-mail accounts and phones searched at the same time.

But I think the Government has said it's iterative. But I think, more importantly, the Court can't make any assumptions about what the Government did or didn't do because they replied to us that they did not use a specific set of search terms but used terms and topics. We asked, "Can we -- do we -- what are those and is there any record of them? Did agents use similar terms? Was there any protocol?" And we don't have any response.

**THE COURT:** All I'm saying is that these devices

sometimes could have, you know, depending on the device -- right? -- significant amounts of data, significant amounts of data. It is the topic that is plaguing federal courts right now.

So you get a device which has -- I don't know.

What's the biggest you've ever seen, Mr. Farnham? A gigabyte?

**MR. FARNHAM:** The devices -- the cloud is where it's at and 200,000 e-mails is not an uncommon number.

**THE COURT:** Which in the old days -- right? -- would have been multiple file cabinets' worth of stuff. I don't know.

**MS. HALBERT:** So I -- what -- excuse me.

What we would propose is that -- and, again, this only arose because of the limited search terms that we got. We all assumed that the Government would have searched for things like "mayor," "Larry Gallegos," the three city administrators who are proposed -- the Government has claimed were being pressured by Sheng Thao. We assumed that -- "EWD," "Economic Workforce Development." So the reason this is coming up now is because we learned new information since Friday.

**THE COURT:** It still doesn't answer the question that I'm grappling with.

**MS. HALBERT:** Yes.

**THE COURT:** I understand you want them to go do a

search. I understand that. You don't have to argue that any more. I understand that. That doesn't answer the question.

Does anybody on that side have an answer to my question?

**MS. HALBERT:** Your Honor, is that what law compels it?

**MR. FARNHAM:** Your Honor, in fact, there's authority --

**THE COURT:** You can't --

**MR. FARNHAM:** I'm sorry.

**THE COURT:** I am struggling with the fact that there have to be some rules or metrics about what they have and what they don't have for a whole variety of reasons.

And what you're saying is: You got a device and even though at the time you got the device, you did your search based upon what you thought the search warrant authorized. We want you to go back and redo it in a way that we think the search warrant authorizes it with all these other things.

So I'm trying to look at this a bit more objectively to understand what obligations there are under the law when in reality they don't technically -- they haven't technically seized anything beyond what they seized.

**MS. HALBERT:** Well, they seized the entire account.

**THE COURT:** No, they didn't. That's not the way it works.

They have -- the whole point of the seizure under the law is that you've only seized what the magistrate judge

authorized. And the reason they have a filter team is because you have not, in fact, seized anything beyond what the scope of the warrant is. So everything else beyond that nucleus, everything else beyond the nucleus is not, in fact, seized.

**MS. HALBERT:** So we don't --

**THE COURT:** But you want them to go re-search beyond the nucleus things that were not previously seized now.

**MS. HALBERT:** We don't know what was seized because the Government has not told us if there was even -- I mean, the warrant -- the Attachment B is very broad. It's anything relating to this scheme. So that only is given actual meat depending on what search terms they use. And what we don't know is: Were agents just allowed to -- were they searching generally? Were there actual parameters? Mr. Farnham said it was iterative.

**THE COURT:** It is -- right.

**MS. HALBERT:** We don't know.

**THE COURT:** Well, you go into a house under -- in the old days we went into a house and you physically seized things and you took it out, and you left everything else in the house; and if they took more than what -- I mean, there are all sorts of motions that people file when they take more, but what they don't do is say, "Hey, go back to the house and redo your search and bring me more materials because you know what? We don't think that when you went into the house to seize, you

seized enough."

**MS. HALBERT:** It's true, and I think that the unique issue that arises with things like e-mails is the Government had to apply certain parameters. It did something. It delegated to agents or attorneys.

**THE COURT:** Right. Whatever it is that they did, they reduced what was in the house to a group of things, a group of data, and that is what they seized. That's it. And whether or not you -- you know, what I'm -- the reason that I'm going back to the house is because that's something that physically you can, you know, get your arms around. They don't have the house. They only have what they took out from the house.

**MS. HALBERT:** But we don't know what they took out of the house. With a search warrant, there's a return of warrant where there's a list. Here we have the Government saying it was --

**THE COURT:** I thought what they took out was 200 and --

**MR. FARNHAM:** Well, Your Honor, I have an answer to that issue.

**THE COURT:** Okay.

**MR. FARNHAM:** We produced what we took out of the e-mail house. We provided it to Defense. We produced what we seized pursuant to the warrant. It's 4,000-plus e-mails. I don't understand what the reference is to, "We don't know what

was seized," because we actually provided it to the Defense.

**MS. HALBERT:** Okay. Well, we don't --

**MR. FARNHAM:** So -- and I have -- Your Honor, if I could address a few points.

First, I want to address the search-term issue. We never suggested that the terms that we've initially proposed to the Defense were the only terms used by the case team to look at these e-mails. It was a process that involved using search terms and trying to identify materials that were in the topics in different ways.

And this is not -- none of what we have been talking about on October 1st last week or today is about how that search was done, and it's being raised now but I think it's too late.

And bar -- there is authority, to Your Honor's point about what the Government has in our possession, that what we have in our possession is what's seized and scoped under the warrant and not the other materials; for example, the rest of the materials that Microsoft provided to us under the warrant terms that said, "We must search that and then seize." What we've seized is the 4,000 e-mails, and that's what we've already provided to Defense.

The authority generally is that we're not in possession of the things that we did not seize, and that's by order of the Court in terms of the warrant.

One thing that I think is happening here is that the

Defense is holding against us our, basically, flexibility in dealing with the issue that came up on October 1st.

So what we did is we said, "Here's a starting point. Here's some search terms that we propose to use for Mario Juarez's e-mail to identify relevant things in the potentially privileged set, because we know we have to go back to that. There's no question we have to go back to that. Here are some proposed search terms." They countered with a bunch of search terms.

So what they're doing is they're holding against us our willingness to basically, like, compromise and accept some of their search terms, but that does not affect the original steps that the Government took to properly execute the warrant in this case and shouldn't affect the scope of what we seized; and them wanting to revisit it I think is contrary to the order, contrary to the law, and hasn't really been raised until now.

The other thing that is interesting here is that obviously the idea of relevancy for the Defense today, a little more than a week before trial, is very different than anything was during the investigation.

For example, apparently a cancer diagnosis is potentially relevant. That's certainly not anything that was within the scope of the warrant in 2024 and that the Government could have seized. So the fact that the idea of relevancy for the Defense has shifted does not change or alter the appropriateness and

effectiveness of the seizure that the Government did pursuant to the warrant.

**THE COURT:** Okay. Where are we?

**MS. HALBERT:** Your Honor, we -- the reason -- I think what we will have to do is if the Government -- if the Court holds that the Government is done with its obligations, which I don't think it should because the Government does have an ongoing --

**THE COURT:** It's not entirely done, but what I haven't heard -- what I'm not prepared to order on this record is that they go back and effectively attempt to reseize things that they haven't seized.

**MS. HALBERT:** Your Honor, I think that the Court should be very concerned that the Government -- the Government says that we somehow in the -- violated the spirit of compromise. It is so concerning that we got a list of 34 search terms that they think cover the universe of what's relevant and material in this case and that that didn't include "Larry Gallegos," "emergency ordinance," the city administrators. That is so concerning.

And while we don't know what they actually searched back then, we do have -- the Defense has to be able to know what Mario Juarez was writing in his e-mails about Larry Gallegos, the person who supposedly was the plant to carry out the plan; or Jestin Johnson, Harold Duffy, Steven Falk, people, who were

supposedly pressured to hire Gallegos. The entity -- HCD, the entity that supposedly was going to do Sheng Thao's bidding. EH --

**THE COURT:** I understand --

**MS. HALBERT:** Yeah.

**THE COURT:** -- and that's why I asked you for some authority, and I don't have it yet. I don't have authority in front of me because -- you know, effectively what this means is if I do this, we're continuing the trial. I don't know, a week, two weeks, we're going to be in trial. And that's fine if that's what it requires.

But I'm not doing that without a legal basis to do it, and I'll go back to where I started, which is that you're effectively asking me to have the Government go back and reseize documents or do an analysis to reseize, and I don't have authority for that very broad and what I think is probably a unique proposition. Certainly not -- so, you know, if you can find something, I'm happy to look at it, but you've not given it to me today.

So I think at this point where we are is you've got --

**MR. FARNHAM:** Your Honor, I want to say one thing on this, if I could, and then for the plan moving forward.

Ms. Halbert continues to misrepresent what I say about the search terms used. We used a variety of tools to review that materials. It was not limited to the search terms we sent to

them as a start of a compromise to solve a different problem. That's not what I've said, and she's misrepresenting the -- she's taking more into the words that we said in an e-mail than are warranted, and that's not -- that's not what happened.

We did an appropriate search under the warrant. It was not limited to the search terms that we first proposed to address this problem, the current problem.

**THE COURT:** All right.

**MS. HALBERT:** Your Honor, since I've been accused of misrepresenting, this is Abe Fine's e-mail to Doug Sprague [as read]:

"As to your first question, the agent reviewing Juarez's e-mail account did not use a specific set of search terms but used terms and topics set forth in Attachment B of the warrant to identify materials. There is no requirement to use search terms to review electronic evidence.

"And as for the review we are doing now, the use of search terms is intended to be the quickest way to provide the Defense with a relevant set of materials from the relatively small categories of materials not yet reviewed."

That was what the Government said.

**THE COURT:** I understand.

**MR. FARNHAM:** Entirely consistent with my position

today.

**THE COURT:** I also understand that when people are working very long hours trying to get ready for trial and trying to get things out, they sometimes do not use the best choice of words. No one in this courtroom, so far, do I have reason -- at least, well, I don't know back there, certainly no one in front of the bar -- do I have reason to believe are unethical lawyers on either side of the V.

So, yes, perhaps it was a sloppy e-mail. No, I don't think that either of you are lying to me. And believe me, there are plenty of people who I've indicated I think were lying to me.

All right. So where are we?

**MR. FARNHAM:** Your Honor, so for the -- for the, I guess I would call it, the most -- the potentially relevant bucket or the bucket that we should be searching for relevancy, that's 4,000-and-some e-mails from Mario Juarez's account that were released through this -- the process over the weekend. We would propose running the search terms proposed by the Defense on those and providing those to the Defense --

**THE COURT:** And, hopefully, that can be done --

**MR. FARNHAM:** -- minus --

**THE COURT:** -- by the end of the day or when? How can we -- this needs to be done pretty quickly.

**MR. FARNHAM:** Oh, I understand. We have it in our

system. Let's say by tomorrow and, hopefully, by the end of the day.

**THE COURT:** Tomorrow when?

**MR. FARNHAM:** Tomorrow at noon.

**THE COURT:** Do you want the 9,160 newsletters and mass e-mails and junk e-mails?

**MR. GUGELMANN:** I don't -- Your Honor, I have faith that Paul Weiss has a system that screens that effectively. I guess what I would ask is that they be produced to us maybe in a separate set so that we can run our own searches against it.

**THE COURT:** And that's fine with you to do that after the fact so they can focus on this 4,000?

**MR. GUGELMANN:** Yes. I think -- speaking, I think, for -- yeah, speaking for the Defense, that's fine.

**THE COURT:** Okay. I will note for the record I saw everybody's head nodding except I didn't -- I could not see Ms. Halbert.

**MS. HALBERT:** Yes.

**THE COURT:** That's acceptable to her as well.

**MR. FARNHAM:** And I'll note that, like I said, it's not -- I mean, it will hit on 2700 e-mails approximately, but we're erring on the side of leniency -- right? -- and broader disclosure.

I'm just making sure the Defense is not going to later claim that we're dumping materials on them. I think that this

is a way to get them in their hands quickest, and then they can use whatever tools they want to identify the actual things that are important to them.

**THE COURT:** If you need to see me, I'm here all day on Thursday.

**MR. SPRAGUE:** I think we're already here on Thursday before you, Your Honor, I think at 2:30 Thursday afternoon.

**THE COURT:** What are we doing on Thursday?

**THE COURTROOM DEPUTY:** 2:30, Your Honor.

**THE COURT:** What are we doing?

**MR. SPRAGUE:** The tax return motion related to Mr. Juarez and his -- one of his corporate entities, Your Honor.

**THE COURT:** All right. Well, if you need to talk to me before then, phone is the best way to find me.

Have you-all been meeting and conferring on potential jury -- or juror excusals?

**MR. FARNHAM:** We haven't been in contact yet, but we plan to.

**MR. GUGELMANN:** Yes, we haven't started that yet --

**THE COURT:** All right.

**MR. GUGELMANN:** -- but we understand the Court -- I think it's Wednesday is our deadline to get back to the Court.

**THE COURT:** The sooner you get it to us, the sooner we can get you the list.

**MR. GUGELMANN:** Understood.

**THE COURT:** So just an FYI.

All right. We'll stand in recess. I'll see you on Thursday.

**MR. GUGELMANN:** Thank you, Your Honor.

**MR. SPRAGUE:** Thank you, Your Honor.

**MS. HALBERT:** Thank you, Your Honor.

**THE COURTROOM DEPUTY:** Court is in recess.

(Proceedings adjourned at 10:38 a.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Tuesday, October 6, 2026

Kelly Shainline, CSR No. 13476, RPR, CRR
U.S. Court Reporter