Had Edward W. Swanson (SBN 159859)
August P. Gugelmann (SBN 240544)
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, CA 94104
Telephone: (415) 477-3800
Facsimile: (415) 477-9100
Email: ed@smllp.law
Email: august@smllp.law

Neal J. Stephens (SBN 152071)
Jeffrey B. Schenk (SBN 234355)
Thao Donnelly (SBN 355632)
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
Telephone: (650) 739-3939
Facsimile: (650) 739-3900
Email: nstephens@jonesday.com
Email: jbschenk@jonesday.com
Email: tdonnelly@jonesday.com

Attorneys for Defendant
DAVID TRUNG DUONG

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SHENG THAO, et al.,<br><br>Defendants. | Case No. CR 25-0003 YGR<br><br>**DEFENDANTS' MOTION TO DISMISS REGARDING *NAPUE* VIOLATIONS** |

# TABLE OF CONTENTS


Page

I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 2

III. LEGAL STANDARD ..... 4

A. The Ninth Circuit's Skeptical View Of Cooperating Witness Testimony ..... 4

B. Legal Standard Governing A *Napue* Claim ..... 5

IV. ARGUMENT ..... 7

A. Juarez Testified Falsely Regarding Submitting Fraudulent Expense Reports To Evolutionary Homes ..... 7

1. Juarez Lies about Defrauding the Duongs. ..... 7

2. The Government Knew That Juarez's Testimony Was False and Failed to Correct the Falsity. ..... 9

3. The False Testimony Regarding Juarez's Altered Expense Reports Is Material. ..... 11

B. Juarez Testified Falsely About Covert Recordings Of The Evolutionary Homes Board Meetings ..... 13

1. Juarez and Mendez Testified Falsely on Direct Examination Regarding the Covert Tape Recordings. ..... 13

2. The Government Knew or Should Have Known that Mendez and Juarez Had Testified Falsely about the Covert Recordings. ..... 15

3. The False Testimony Regarding the Covert Recordings Is Material. ..... 16

C. Juarez Falsely Testified That He "Confessed It All" To The Oakland Police Department On May 5, 2024 ..... 17

D. Juarez Lied About Both The Origin And Value Of His Gold Chain ..... 19

E. The Cumulative Impact Of Juarez's Multiple Examples Of False Testimony Exacerbates The Constitutional Prejudice ..... 22

F. Dismissal With Prejudice Is The Appropriate Remedy ..... 22

V. CONCLUSION ..... 23

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Burleson v. Kernan*,
2007 WL 3478432 (N.D. Cal. 2007)........................................................................ 17

*Clements v. Madden*,
112 F.4th 792 (9th Cir. 2024) .................................................................... 6, 16, 21, 23

*Commonwealth of Northern Mariana Islands v. Bowie*,
243 F.3d 1109 (9th Cir. 2001)......................................................................... 5, 21, 23

*Dickey v. Davis*,
69 F.4th 624 (9th Cir. 2023) ............................................................................ passim

*Glossip v. Oklahoma*,
604 U.S. 226 (2025) ......................................................................................... passim

*Hayes v. Brown*,
399 F.3d 972 (9th Cir. 2005)........................................................................... 5-7, 23

*Jackson v. Brown*,
513 F.3d 1057 (9th Cir. 2008).................................................................................. 6

*Napue v. Illinois*,
360 U.S. 264 (1959) ......................................................................................... passim

*Phillips v. Ornoski*,
673 F.3d 1168 (9th Cir. 2012).................................................................................. 5

*Sivak v. Hardison*,
658 F.3d 898 (9th Cir. 2011)............................................................................... 7, 23

*United States v. Agurs*,
427 U.S. 97 (1976) ............................................................................................ 7, 23

*United States v. Alli*,
344 F.3d 1002 (9th Cir. 2003).................................................................................. 5

*United States v. Bernal-Obeso*,
989 F.2d 331 (9th Cir. 1993)........................................................................... 4–5, 21

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Chapman*,
524 F.3d 1073 (9th Cir. 2008) ... 22

*United States v. LaPage*,
231 F.3d 488 (9th Cir. 2000) ... passim

*United States v. Preston*,
873 F.3d 829 (9th Cir. 2017) ... 22

*United States v. Vest*,
813 F.2d 477 (1st Cir. 1987) ... 17

**STATUTES**

18 U.S.C. §§ 873, 875 ... 17

18 U.S.C. § 1951 ... 17

18 U.S.C. § 2511(2)(d) ... 17

18 U.S.C. § 2515 ... 17

California Penal Code § 518 ... 17

California Penal Code § 632(a) ... 16

**OTHER AUTHORITIES**

U.S. Const. amend. V ... 1, 12, 22–23

U.S. Const. amend. VI ... 1, 12, 22–23

## I. INTRODUCTION

A criminal trial cannot serve as a reliable search for the truth when the government allows a witness's false testimony to stand uncorrected before the jury. Under *Napue v. Illinois*, 360 U.S. 264 (1959), the government violates a defendant's Fifth Amendment right to due process—and irreparably compromises the integrity of the trial proceedings—when it elicits or fails to correct false testimony that could reasonably affect the judgment of the jury. Here, Mario Juarez repeatedly crossed that constitutional line by falsely testifying about key factual issues in dispute. Compounding his inherent bias as a cooperating defendant, the government knew that Juarez harbors an intense personal animus and motive for vengeance against the defendants. Thus, the government knew that Juarez took the stand to settle a score—the type of volatile, unpredictable witness where prosecutors need to sit on the edge of their seats ready to prevent their witness from corrupting the truth-seeking function of the criminal justice system. Here, however, the government failed to stop Juarez from polluting the trial with false testimony. Instead of springing into action to prevent false testimony, the government failed to correct a single false impression during Juarez's redirect and even objected to certain aspects of cross-examination.

Juarez's misconduct extended beyond his false trial testimony. It also infected the conduct of the prosecution team. The government repeatedly protected Juarez by refusing to follow basic investigatory protocols into any topic that might expose Juarez for who he is—a pathological liar devoted to bending every aspect of the justice system to his will. Juarez had one goal: to be the star witness responsible for convicting the defendants, no matter the damage he needed to inflict on the integrity of the justice system to accomplish his objective. To that end, Juarez repeatedly offered false testimony that the government knew or should have known was false—a serious violation of controlling Supreme Court and Ninth Circuit precedent. Because the government's failure to correct the *Napue* violations could have made a powerful difference in the jury's assessment of Juarez's trustworthiness and willingness to lie, no curative instruction can undo the prejudice. As a result, dismissal with prejudice is required due to the violation of the defendants' Fifth Amendment right to due process and Sixth Amendment rights to confront their primary accuser and present a complete defense.

## II. FACTUAL BACKGROUND

The government went to great lengths to shield Juarez from damaging impeachment. Four quick examples highlight a consistent pattern that frustrated defense counsel's ability to present an accurate picture of Juarez to the jury. All four examples expose the same flaw in the government's handling of Juarez—once the government suspected that any further inquiry would uncover *Brady*/*Giglio* type impeachment on Juarez, they stopped investigating.

First, after discovering that Juarez had fraudulently altered expense reimbursement documents he had submitted to the Duongs in 2023, the prosecution team decided to stop any further investigation. On November 6, 2026, after hearing a defense attorney cross-examine Juarez about altering documents from one of his earlier fraud schemes in 2010, IRS Agent Stegner analyzed a few expense reimbursement documents Juarez submitted to the Duongs in 2023. Stephens Decl., ¶¶ 10, 13 at Exhibit 1 (Tr. Vol. 19 at 4267:19–4270:21) and Exhibit 2. Agent Stegner concluded that Juarez had defrauded the Duongs. Stephens Decl., ¶ 5, Exhibit 4 (Tr. Vol. 20 at 4461:9–17).

On Saturday, November 7, Agent Stegner shared her findings with "the prosecutors on the case." Stephens Decl., ¶ 3 at Exhibit 2. Even though Agent Stegner and the prosecutors knew Juarez had altered his bank records and was set to continue testifying on cross-examination the following Monday, the prosecution team decided to do nothing. They did not prepare a report. They did not continue investigating. They did not inform the Court. They did not disclose the information to defense counsel. Instead, they decided to not take any additional steps to investigate the depths of the fraud scheme Juarez perpetrated against the Duongs—which is central to the defense theory of the case because Juarez's embezzlement of the Duongs' investment funds triggered the break-up of their business relationship at Evolutionary Homes ("EH").

When questioned to explain why the prosecution team stopped investigating, Agent Stegner admitted that "I wouldn't say there was any type of stated plan. We looked at it. It looked like there was that … the documents were altered, the ones that I had shown. And then that was – then we – ***that was it.***" Stephens Decl., ¶ 4 at Exhibit 3 (Tr. Vol. 22 at 4996:25–4997:8)

(emphasis added). When asked how an IRS CI agent holding altered bank records fails to continue investigating, Agent Stegner responded, "***Yeah, I don't think we made any type of a stated plan or anything to continue reviewing it. Yeah, that's all I've got.***" Stephens Decl., ¶ 5 at Exhibit 4 (Tr. Vol. 20 at 4997:9–16) (emphasis added).

Second, even though Juarez's plea agreement requires Juarez to provide the government with any documents it requests from him, the government never asked Juarez for his electronic devices so the government could secure and review those documents. Juarez began cooperating in June 2024, so his electronic devices would have contained information from inside the alleged conspiracy period—which ran from October 7, 2022 through June 20, 2024. Stephens Decl., ¶¶ 6–9 at Exhibits 5–8 (Ex. 1885; Tr. Vol. 6 at 1377:3–1379:13; Tr. Vol. 7 at 1444:14–21; Tr. Vol. 8 at 1660:24–1665:7).

In addition, Juarez's devices would have contained his communications after June 2024, which likely would have included *Brady/Giglio* information, including any communications about the case with Cecilia Mendez, other potential witnesses, and the media. But the government opposed defense counsel's motion to obtain this information, thereby denying access to an inevitable treasure trove of *Brady/Giglio* material. Dkt. 401, 402, 406, 412 and 414.

For example, Juarez confirmed that he repeatedly communicated with Cecilia Mendez including around the dates that she met with the government to discuss her potential testimony, and immediately before and after her trial testimony. Stephens Decl., ¶ 10 at Exhibit 9 (Tr. Vol. 16 at 3610:25–3611:22). Having access to those texts and emails, which the government could obtain by simply asking Juarez for his devices, would have provided additional context to the false testimony that Juarez and Mendez told the jury regarding Juarez's knowledge of the covert tape recording of the EH board meetings, discussed in detail below. Those discussions likely would have confirmed that Juarez directed Mendez to tape record those conversations to gain leverage over the Duongs—which would supply additional evidence of their violation of the federal wiretap statutes.

As another example, Juarez testified that he communicated with various news media outlets about this case, including Dan Noyes at ABC (who he refers to as simply "Dan"), the San

Francisco Chronicle, and a bunch of other reporters because he wanted the media to publish his version of the events. Stephens Decl., ¶ 10 at Exhibit 9 (Tr. Vol. 16 at 3603:23–3605:24). Juarez's communications with the media would have yielded impeachment material because they would have exposed his bias against the defendants and penchant for modifying his story to fit whatever his need is in that particular moment.

Third, Juarez's plea agreement does not provide any protection related to criminal tax violations. Stephens Decl. ¶ 6 at Exhibit 5 (Ex. 1885). The government, however, refused to ask Juarez for his tax records and also refused to seek copies of his tax returns, even though IRS-CI was a lead agency on this matter. Stephens Decl., ¶ 5 at Exhibit 4 (Tr. Vol. 20 at 4354:10–4356:16). The government also opposed defendant's pre-trial motion seeking this information. Dkt. 373, 375, 390, 391, and 392. At trial, to no one's surprise, Juarez admitted on cross-examination that he has not filed tax returns for himself or his various companies since approximately 2020. Stephens Decl., ¶ 11, Exhibit 10 (Tr. Vol. 18 at 3955:2–3956:21, 3958:7–3960:20); Stephens Decl., ¶ 5, Exhibit 4 (Tr. Vol. 20 at 4351:19–4352:18). Thus, Juarez is a ripe target for tax prosecutions related to both his failure to file tax returns and tax evasion. Stephens Decl., ¶ 5, Exhibit 4 (Tr. Vol. 20 at 4355:20–4356:16; 4461:9–21; 4476:17–4478:5). Instead of terminating his plea agreement for continuing to commit crimes, the government has done nothing. The government refuses to take any action to investigate Juarez's likely violation of both civil and criminal tax statutes. *Id.*

Fourth, as explained in detail below, the government repeatedly protected Juarez during trial by refusing to correct the false impression Juarez delivered to the jury and objecting when defense counsel sought to impeach that false testimony.

## III. LEGAL STANDARD

### A. The Ninth Circuit's Skeptical View Of Cooperating Witness Testimony

The Ninth Circuit has described the use of cooperating witnesses, like Juarez, as "fraught with peril." *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993). "Criminals caught in our system understand they can mitigate their own problems with the law by becoming a witness against someone else." *Id.* at 334. "Some of these informants will stop at nothing to

maneuver themselves into a position where they have something to sell." *Id.* at 333. Put another way, due to "the perverse and mercurial nature of the devils with whom the criminal justice system has chosen to deal, each contract for testimony is fraught with the real peril that the proffered testimony will not be truthful, but simply factually contrived to 'get' a target of sufficient interest to induce concessions from the government." *Commonwealth of Northern Mariana Islands v. Bowie*, 243 F.3d 1109, 1124 (9th Cir. 2001). "Defendants or suspects with nothing to sell sometimes embark on a methodical journey to manufacture evidence and to create something of value, setting up and betraying friends, relatives, and cellmates alike." *Id.* "Such false testimony and false evidence corrupts the criminal justice system and makes a mockery out of its constitutional goals and objectives." *Id.* The journey with Juarez on the witness stand generated every red flag described by the Ninth Circuit in *Bernal-Obeso* and *Bowie.*

### B. Legal Standard Governing A *Napue* Claim

"One of the bedrock principles of our democracy, 'implicit in any concept of ordered liberty,' is that the State may not use false evidence to obtain a criminal conviction." *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (en banc) (quoting *Napue*, 360 U.S. at 269). In *Napue*, the Supreme Court held that a conviction knowingly obtained through the use of false evidence violates the Due Process Clause. *Id.*; *Glossip v. Oklahoma*, 604 U.S. 226, 246 (2025). *Napue* extends to false testimony related to the credibility of a witness because "a lie is a lie, no matter what its subject." *Napue*, 360 U.S. at 269–70.

*Napue* also applies to false testimony elicited on cross-examination. *Id.* at 269 ("[T]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."); *Hayes*, 399 F.3d at 978 (same); *United States v. Alli*, 344 F.3d 1002, 1007 (9th Cir. 2003) (same); *Phillips v. Ornoski*, 673 F.3d 1168, 1181 (9th Cir. 2012) (same).

In addition, where prosecutors know their witness has lied, they have an affirmative constitutional duty to correct the false impression of the facts, even where the defense attorney had cross-examined the witness about the false testimony. *United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000); *Clements v. Madden*, 112 F.4th 792, 802 (9th Cir. 2024). "The

government's duty to correct perjury by its witnesses is not discharged merely because defense counsel knows, and the jury may figure out, that the testimony is false." *LaPage*, 231 F.3d at 492. This is particularly applicable with a biased, vengeful cooperating witness like Juarez because "all perjury pollutes a trial, making it hard for jurors to see the truth." *Id*. Indeed, the Ninth Circuit encourages prosecutors to interrupt their own questioning and work with the judge and defense counsel to immediately inform the jury that the witness's testimony is false. *Id*. By contrast, prosecutors should not sit silently as their witness lies and attempts to evade defense counsel's cross-examination, because jurors listen to defense counsel with skepticism given the duty of advocacy they owe to their clients. *Id*. Thus, a prosecutor has a special duty commensurate with a prosecutor's unique power to assure that defendants receive a fair trial—and that includes the duty to affirmatively correct any false testimony provided by a government witness. *Id*.

*Napue* also applies where the prosecutors may be unaware of the falsity of the witness's testimony but their law enforcement agents on the prosecution team are aware of the falsity. *Clements*, 112 F.4th at 802 (citing *Jackson v. Brown*, 513 F.3d 1057, 1075 (9th Cir. 2008)) ("*Napue* and *Giglio* make perfectly clear that the constitutional prohibition on the 'knowing' use of perjured testimony applies when *any* of the State's representatives would know that the testimony is false.") (emphasis in original).

To prevail on a *Napue* claim, defendants bear the burden to show that (1) Juarez's testimony was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material. *Hayes*, 399 F.3d at 984; *Dickey v. Davis*, 69 F.4th 624, 636 (9th Cir. 2023). The standard for materiality is "considerably less demanding" than other materiality standards on constitutional claims arising in criminal cases. *Clements*, 112 F.4th at 802. The Supreme Court adopted the more lenient materiality standard in *Napue* cases because they involve "a corruption of the truth-seeking function of the trial process." *Id*. Accordingly, the *Napue* inquiry requires only that there be "any reasonable likelihood" that the false testimony could have affected the judgment of the jury. *Id*. (emphasis in original) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)).

Finally, if the defense establishes that the government knowingly permitted the introduction of false testimony, "reversal is virtually automatic." *Hayes*, 399 F.3d at 978; *Sivak v. Hardison*, 658 F.3d 898, 912 (9th Cir. 2011).

## IV. ARGUMENT

Defendants present four separate *Napue* violations: (1) Juarez's testimony regarding the accuracy of expense reports he submitted to the Duongs for reimbursement; (2) Juarez's knowledge regarding the covert tape recordings of EH board meetings; (3) Juarez's claim that he "confessed it all" to the Oakland Police Department ("OPD") when he reported a claim against the defendants on May 5, 2024; and (4) Juarez's claim that his deceased father had given him a gold chain worth $50,000.

### A. Juarez Testified Falsely Regarding Submitting Fraudulent Expense Reports To Evolutionary Homes

#### 1. Juarez Lies about Defrauding the Duongs.

On direct and cross-examination, Juarez testified falsely about having submitted accurate reimbursement requests related to EH. As some preliminary background, Juarez submitted an expense report for roughly $83,000 (Ex. 599) and received $83,000 from EH as reimbursement. Stephens Decl., ¶ 12, Exhibit 11 (Tr. Vol. 14 at 3051:4–3052:23); Stephens Decl., ¶ 13, Exhibit 12 (Ex. 599). Cross-examination of Juarez demonstrated that the reimbursement request was false in two distinct ways.

***First***, the request included entries that do not match Juarez's bank records. For example, a comparison of Juarez's bank records (obtained by the government via grand jury subpoena) reveals that he added $100 to flight reimbursement requests. Stephens Decl., ¶ 12, Exhibit 11 (Tr. Vol. 14 at 3055:8–3057:19); *compare* Stephens Decl., ¶¶ 14–15, Exhibit 13 (Ex. 5146 at pages 3–4 showing $223.98) and Exhibit 14 (Ex. 5147 at pages 2–3 showing $223.98) against Exhibit 12 (Ex. 599 at page 7, showing $323.98). Thus, for a December 4, 2022 Southwest flight, Juarez claimed $323.98 but had paid only $223.98. In some instances, as Agent Stegner's analysis shows, Juarez also included reimbursement requests for expenses that do not appear in his bank records at all. Stephens Decl. ¶ 3, Exhibit 2. As discussed below, the government knew

Juarez had defrauded the Duongs through his false expense reimbursement requests before he testified.

***Second,*** Juarez forged supporting documentation. Here, he (or someone acting at his direction)[1] altered credit card statements to include non-existent charges. For example, he doctored bank statements so that he could seek inflated reimbursements from the Duongs for his June 15, 2024 and June 16, 2024 flights. Stephens Decl., ¶¶ 12, 16–19, Exhibit 11 (Tr. Vol. 14 at 3060:3–3077:16), Exhibit 15 (Trial Ex. 5262 showing $348.98 charge) compared to Exhibit 16 (Trial Ex. 5263, real bank statement showing no $348.98 charge); Exhibit 17 (Trial Ex. 5252 showing $353.98 charge); Exhibit 18 (Trial Ex. 5253 showing $432.58 charge). It appears the government learned of this category of fraud after Juarez began his cross-examination.

On direct examination on November 5, Juarez testified that he had submitted expense reports and ***matching*** receipts:

> Q. You say, lastly [as read from Ex 952]:
>
> "Lastly, I want to address outstanding reimbursements for travel and other expenses which are essential for maintaining our operational efficiency for me. I was told to go to Mexico and work on tasks, and now two minor items are holding up repayment of my expense report."
>
> What are you describing there?
>
> A. So throughout the months after I brought the units, around August, I submitted extensive reports, expenditures, receipts, matching them.

Stephens Decl., ¶ 20, Exhibit 19 (Tr. Vol. 12 at 2700:2–12). At the time the government elicited this testimony, it is defense counsel's understanding that the government knew, based on Agent Stegner's spreadsheet, that the expense reports Juarez submitted did not "match" the receipts but contained many entries that do not appear in his bank records. Stephens Decl. ¶ 3, Exhibit 2.

On Monday, November 9, 2026, when asked on cross-examination whether he had padded the reimbursement figures, Juarez answered: "No." Stephens Decl., ¶ 12, Exhibit 11 (Tr. Vol. 14

---

[1] Whether Juarez himself forged the records or instructed someone else to do it is immaterial. It is undisputed that (1) the original records were from Juarez's accounts, (2) the forgeries added entries that did not exist on the true records, and (3) Juarez benefitted from the fraud when he received reimbursement for the false entries.

at 3053:9–11). Asked whether he added $100 to every airline flight he submitted, Juarez said, "I don't remember that." *Id.* Eventually, he conceded that the amounts on the reimbursement request "appear[] not [to be what he paid], yes." Stephens Decl., ¶ 12, Exhibit 11 (Tr. Vol. 14 at 3055:8–23). When defense counsel asked Juarez whether he had "padded [his] bills and lied about how much things cost when [he] sought reimbursement," Juarez would concede only: "I see there's the discrepancy, yeah," and, "I can see the issue of the amounts." Stephens Decl., ¶ 12, Exhibit 11 (Tr. Vol. 14 at 3057:15–3058:6).

After showing these exhibits to Juarez (Stephens Decl., ¶ 12, Exhibit 11 (Tr. Vol. 14 at 3065:20–3077:16)), defense counsel asked whether these exhibits showed "plain and simple, what you did when you submitted your request for reimbursement to the Duongs, you forged, fabricated, altered a number of Chase bank statements to try to justify the expenses, isn't that true?" Juarez responded falsely, "that's not correct." Stephens Decl., ¶ 12, Exhibit 11 (Tr. Vol. 14 at 3077:3–9).

On cross-examination by counsel for Andy Duong, Juarez conceded that he "probably" told Mendez and his assistant Carlos Johnson to falsely increase expenses: "I may have said that, yes," and, "Probably said that." Stephens Decl., ¶ 10, Exhibit 9 (Tr. Vol. 16 at 3619:7–23). He also acknowledged: "[I]t may be that I have said that -- inflate some other stuff, and I don't disagree with that." *Id.* at 3620:9–11.

On November 16, on recross examination by counsel for David Duong, Juarez finally testified that he had directed the alteration of documents he submitted to the Duongs. Stephens Decl., ¶ 11, Exhibit 10 (Tr. Vol. 18 at 3898:22–3899:7).

**2. The Government Knew That Juarez's Testimony Was False and Failed to Correct the Falsity.**

The government knew that Juarez was lying when he testified during his direct examination that his expense reports "matched" receipts and when he denied, on cross, that he had padded his expense reports and forged supporting documents. With respect to Juarez's testimony on direct, testimony of Agent Stegner reveals that, as of at least October 5, 2026, the government knew that Juarez's reimbursement request included multiple entries that did not

appear on any bank record. Agent Stegner testified that, prior to meeting with Juarez on October 5, she had created an "unable to locate" column on her spreadsheet that reflected entries on the reimbursement request that she "wasn't able to locate it anywhere in Mario Juarez's bank accounts." Stephens Decl., ¶ 4 at Exhibit 3 (Tr. Vol. 22 at 4986:3–7, 4966:4–5). The entries in the "unable to locate" column add up to over $24,000 of the roughly $83,000 in purported expenses that Juarez listed. Stephens Decl., ¶ 3 at Exhibit 2. Thus, the government knew that Juarez's testimony on direct that his expense report "matched" the receipts was false.

The government learned more during cross-examination. On Friday, November 6, 2026, after hearing a defense attorney cross-examine Juarez about altering documents regarding a criminal charge in 2010, Agent Stegner decided to analyze the expense report that Juarez had submitted to the Duongs in September 2023. She concluded that Juarez had defrauded the Duongs by altering the expense report documents he submitted. Stephens Decl., ¶¶ 3, 5 at Exhibit 2 and Exhibit 4 (Tr. Vol. 20 at 4461:9–17). In addition, on Saturday, November 7, 2026, Agent Stegner shared her findings with the prosecutors and showed them a few examples. Stephens Decl., ¶ 3, Exhibit 2. At that time, the prosecutors did not disclose Agent Stegner's findings to defense counsel or the Court.

As a result, the defense was completely unaware that the government knew that Juarez was lying during his direct and cross-examination. The Ninth Circuit expects prosecutors to take affirmative action when they know their witness is lying to the jury—even when the false testimony initially arises during cross-examination. In *LaPage*, the Ninth Circuit emphasized that prosecutors cannot sit silently as their witness lies and attempts to evade defense counsel's cross-examination because jurors listen to defense counsel with skepticism given the duty of advocacy they owe to their clients. 231 F.3d at 492. Instead, the Court expects that prosecutors will immediately work with the judge and defense counsel to inform the jury that the witness's testimony is false. *Id*. Here, however, the prosecutors sat by and failed to act, thereby abandoning their affirmative duty to correct Juarez's false testimony before it polluted the trial and made it impossible for the jury to see the truth. *Id.*

The government did not merely sit passively as their witness lied; the government actively

objected to defense questions intended to elicit Juarez's fraud. On November 9, 2026, the defense tried to offer evidence that Juarez had submitted altered bank statements to the Duongs to inflate his reimbursement requests. Rather than correcting Juarez's false statements, the government repeatedly objected. Stephens Decl., ¶ 12, Exhibit 11 (Tr. Vol. 14 at 3063:25, 3066:24–25, 3074:13–23). Then, during Juarez's re-cross on November 16, the government again attempted to cut off questioning about Juarez's fraud against the Duongs:

> **Mr. Swanson:** Okay. So—and that was—that was at your direction that those credit card statements that we saw were blocked out and they had fake information about the amount of money that you had spent on various things; is that right?
>
> **Mr. Fine:** Objection, 403.
>
> **The Court:** I'll allow it.
>
> **Juarez:** Even if it was not at my direction, I'm going to accept that it was at my direction. I accept that. It was my directive.

Stephens Decl., ¶ 11, Exhibit 10 (Tr. Vol. 18 at 3898:22–3899:7).

**3. The False Testimony Regarding Juarez's Altered Expense Reports Is Material.**

Juarez's false testimony is material because it goes to the heart of the relationship between the alleged co-conspirators and Juarez's motive to falsely accuse the defendants. Far from operating with unity of purpose with Juarez—as the government alleges—Juarez victimized the Duongs throughout their relationship. Juarez obtained $750,000 from the Duongs based on contractual obligations requiring Juarez to deliver twenty container homes; Juarez delivered only two and repeatedly refused to account for the money the Duongs had entrusted to him to operate EH. Juarez stole even more money from the Duongs by submitting false reimbursement requests seeking thousands of dollars in false expenses. Juarez did not begin stealing from the Duongs after their falling out in the spring of 2024. Juarez submitted the false reimbursement request in October 2023, and he sought reimbursement for false expenses dating back as far as May 2022. Stephens Decl. ¶ 3, Exhibit 2. The Duongs' repeated requests to Juarez to provide an accounting as they grew to suspect his fraud ultimately triggered the falling out between them. As a result, Juarez' false testimony and the government's failure to correct it and disclose Agent's Stegner's analysis impaired defendants' ability to confront Juarez and to present a complete defense. *See*

*Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (the Constitution, through the Due Process Clause of the Fifth Amendment and the Compulsory Process and Confrontation Clauses of the Sixth Amendment, guarantees defendants a meaningful opportunity to present a complete defense); *Davis v. Alaska*, 415 U.S. 308, 316–17 (1974) (the Confrontation Clause of the Sixth Amendment guarantees a defendant the right to cross-examine the bias of a government witness because the partiality of a witness is subject to exploration at trial and is always relevant to discrediting the witness and "jurors [are] entitled to have the benefit of the defense theory before them so they can make an informed judgment on the weight to place on [the government witness'] testimony").

The false testimony is also material because it impacts Juarez's credibility. *Napue* extends to false testimony that impacts the credibility of the witness because "a lie is a lie, no matter what its subject." *Napue*, 360 U.S. at 269–70. In *Glossip v. Oklahoma*, 604 U.S. 226, 247 (2025), the Supreme Court analyzed the materiality of a false statement from the government's main witness, a cooperating defendant, who lied about a medical condition. The witness testified that he had asked for Sudafed but had been given lithium and had never seen a psychiatrist. *Id.* That testimony was false because the witness's medical file—which the government possessed—listed both a lithium prescription and a bipolar diagnosis. *Id.* On appeal, the Supreme Court reconfirmed that "evidence can be material even if it 'goes only to the credibility of the witness'" because "the jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence." *Id.* at 248 (quoting *Napue*, 360 U.S. at 269). The Court reasoned that the witness's credibility would have plainly suffered had the government corrected his false testimony for two reasons: (1) it would have revealed that the witness was untrustworthy, and (2) the witness was willing to lie to the jury. *Id.* As a result, even if the witness's "bipolar disorder [was] wholly irrelevant, . . . [the witness's] willingness to lie about it to the jury was not." *Id.* at 248–49.

Juarez's false testimony regarding the accuracy of his expense reports is material for the same reasons discussed in *Glossip*. It impacts Juarez's credibility—which can be outcome-determinative here—because Juarez's false testimony demonstrates to the jury that Juarez is both untrustworthy and willing to lie to them. *Glossip*, 604 U.S. at 247; *Dickey*, 69 F.4th at 644. In

addition, this false testimony relates to a defense theory in this case—that Juarez had stolen from the Duongs, which led the Duongs to question what Juarez had done with their investment in EH. Notably, the government concedes that Juarez defrauded the Duongs. Stephens Decl., ¶ 5, Exhibit 4 (Tr. Vol. 20 at 4461:9–17).

### B. Juarez Testified Falsely About Covert Recordings Of The Evolutionary Homes Board Meetings

#### 1. Juarez and Mendez Testified Falsely on Direct Examination Regarding the Covert Tape Recordings.

On November 5, 2026, Juarez falsely testified during his direct testimony that he did not know that his long-time business colleague and former romantic partner, Cecilia Mendez, was secretly recording the EH board meetings until a couple of months before trial, which began on October 13, 2026. Stephens Decl., ¶ 10, Exhibit 9 (Tr. Vol. 16 at 3613:5–3616:18). Mendez had told the same lie earlier in the trial during her direct testimony when she falsely testified that Juarez was not aware that she was covertly recording the board meetings. Stephens Decl., ¶ 21, Exhibit 20 (Tr. Vol. 9 at 1880:13–15). On October 28, 2026, after being confronted with a text exchange with Juarez on December 8, 2023, Mendez finally admitted on cross-examination that she had told Juarez about her covert recordings no later than December 8, 2023. Stephens Decl., ¶ 21, Exhibit 20. (Tr. Vol. 9 at 1919:8–13; 1920:2–4; 2003:11–2005:1; 2033:2–22). In her December 8, 2023 text to Juarez, Mendez told Juarez that she could "check the recording" to confirm whether an item had been approved at the EH board meeting on December 5, 2023. Stephens Decl., ¶¶ 21–22, Exhibit 20 (Tr. Vol. 9 at 2003:11–2005:1 and 2033:2–22) and Exhibit 21 (Trial Ex. 5052C1 at p. 10).

During its redirect examination of Mendez, the government did not question Mendez about her false testimony during her direct testimony regarding Juarez's knowledge of her covert recordings, nor did the government question Mendez regarding the text message she sent Juarez on December 8, 2023. *See LaPage*, 231 F.3d at 492 (conviction reversed on *Napue* grounds where the prosecutor failed to affirmatively correct false testimony that defense counsel had addressed on cross-examination).

A week later during trial, on November 5, 2026, the government asked Juarez during his

direct examination whether he did "now, sitting here today, have an understanding as to whether Ms. Mendez was audio recording the Evolutionary Homes' board meetings." Stephens Decl., ¶ 20, Exhibit 19 (Tr. Vol. 12 at 2618:19–23). Juarez falsely responded: "Today I know that she recorded the meetings, and – and ***I didn't know that at the time***." *Id.* (emphasis added). In other words, Juarez expressly denied contemporaneously knowing that Mendez was covertly tape recording the meetings between November 2023 and April 2024. In response to the false testimony it had elicited from Juarez, the government asked no follow-up questions, did not refer to Mendez's prior admission on cross-examination that contradicted the testimony the government had just elicited from Juarez, and did not show Juarez the text message dated December 8, 2023 that defense counsel had previously used with Mendez to establish that Juarez knew Mendez was covertly recording EH board meetings as early as December 8, 2023.

On November 12, 2026, Juarez repeated his false testimony on cross-examination: "I told the Government that I didn't know that they were recording them. If I had known, I would have told Cecilia not to record them." Stephens Decl., ¶ 10, Exhibit 9 (Tr. Vol. 16 at 3613:5–10). Juarez further testified: "I didn't know until very recently. Government played the -- one recording, and I was shocked to hear my voice." *Id.* Juarez placed his first knowledge of the recordings "[i]n the last two or three months," and agreed without qualification that it was "not until well into 2026" that he first learned Mendez had recorded the meetings. *Id.* at 3614:1–17.

When defense counsel asked Juarez whether Mendez told him she had been recording the EH board meetings immediately after the November 13, 2023 board meeting, Juarez claimed not to remember and added: "It would have been very inappropriate for Cecilia to record those meetings, and I would have acted differently on those meetings." *Id.* at 3616:8–10. Juarez maintained his denials even after defense counsel confronted him with an audio recording from November 13, 2023 in which Mendez expressly told him she was recording the EH board meeting. *Id.* at 3617:1–3618:18; Stephens Decl., ¶ 23, Exhibit 22 (Ex. 991AT-1).

Juarez then used his false claim of ignorance regarding the covert recordings to improperly bolster the credibility of the Mendez recordings. On Friday, November 13, 2026, when counsel for Ms. Thao challenged the existence of a deal on cross-examination, Juarez

testified: "You know, it's not my story. It's on recordings. Andy Duong, David Duong, my boys [sic], we didn't know we were being recorded." Stephens Decl., ¶ 24, Exhibit 23 (Tr. Vol. 17 at 3789:8–11). This testimony is significant because the "deal is the deal" recording that the government has repeatedly emphasized throughout trial occurred on November 28, 2023—15 days after Mendez had told Juarez that she was recording. Stephens Decl., ¶ 25, Exhibit 24 (Tr. Vol. 2 at 339:2–7).

As with Mendez's testimony, the testimony the government elicited from Juarez during his direct testimony about when he learned Mendez was secretly recording the EH board meetings was false. On cross-examination, defense counsel impeached Juarez with an audio recording—produced by the government to defense counsel in discovery—that establishes that Juarez knew no later than November 13, 2023, that the EH board meetings were being recorded. Stephens Decl. ¶ 23, Exhibit 22 (Ex. 991AT-1). After Mendez shared this recording with Juarez on November 13, 2023, Juarez did not express any shock nor did he tell Mendez to stop covertly recording the meetings. Instead, during trial, Juarez lied to the jury about his knowledge in November 2023 regarding the secret tape recordings of the EH board meetings.

**2. The Government Knew or Should Have Known that Mendez and Juarez Had Testified Falsely about the Covert Recordings.**

It is undisputed that the government knew that Juarez was aware—as early as November 13, 2023—that Mendez was secretly recording the EH board meetings. The government had produced to defense counsel both the text message and audio recording that defense counsel used to impeach Mendez and Juarez on this point. Stephens Decl., ¶¶ 22–23, Exhibits 21–22. The government also witnessed Mendez testify on cross-examination on October 28, 2026 and heard her recant her false testimony about the recordings before calling Juarez to the stand and having him testify falsely about when he learned that Mendez was covertly recording the EH board meetings. The government also failed to confirm the truth during its redirect examination of both Mendez and Juarez. *See LaPage*, 231 F.3d at 492 (prosecutors have an affirmative constitutional duty to correct false testimony even where the defense attorney cross-examined the witness about the topic); *Clements,* 112 F.4th at 802 (same).

**3. The False Testimony Regarding the Covert Recordings Is Material.**

This false testimony is material for three reasons. First, for the reasons described above regarding his altered expense reports, Juarez's false testimony regarding the covert recordings demonstrates that he was willing to lie to the jury and is untrustworthy. *Glossip*, 604 U.S. at 247. As the government's main witness, the jury's view of Juarez's truthfulness and reliability may determine guilt or innocence. *Id*. at 248 (quoting *Napue*, 360 U.S. at 269). In addition, even if Juarez's knowledge in November 2023 of Mendez's covert recording of the EH board meetings were somehow deemed irrelevant—and it is relevant—Juarez's willingness to lie about it to the jury is highly relevant because it demonstrates that he is untrustworthy and lacks credibility. *Id*. at 248–49; *Dickey*, 69 F.4th at 644 (correcting a witness's false sworn testimony can make a powerful difference in the jury's assessment of the witness's trustworthiness).

Second, secretly recording these meetings violated California Penal Code Section 632(a). That fact was confirmed when the government granted immunity to Mendez regarding her criminal exposure related to the covert recordings. Stephens Decl., ¶ 26, Exhibit 25 (Dkt. 448). Thus, Juarez attempted to improperly bolster his credibility by projecting to the jury that he had not violated the law regarding the covert tape recordings. Stephens Decl., ¶ 10, Exhibit 9 (Tr. Vol. 16 at 3613:5–3616:18). Instead, he falsely transferred all responsibility onto Mendez, in part, to protect his credibility in the eyes of the jury. It also is undisputed that Mendez continued to covertly tape record EH board meetings in 2024—after Juarez knew she was doing so. Stephens Decl., ¶ 22, Exhibit 21, pg. 10. Contrary to his statements on cross-examination, where he testified that he would have stopped the secret recording had he known about it in 2023, Juarez knew Mendez was covertly recording EH board meetings as early as November 13, 2023 but never took steps to stop her from continuing to covertly tape record meetings that Juarez and Mendez continued to attend from November 2023 through April 2024. Stephens Decl., ¶ 27 (Exs. 994–1001).

Third, both Mendez and Juarez lied about the recordings to improperly disguise their true motivation to secretly tape record these meetings. Juarez's appetite for vengeance against the Duongs has been confirmed during the trial—through his April 24, 2024 email that explicitly

threatened the Duongs, as well as his June 4, 2024 text to Andreas Cluver where he confirmed that he intended to "f*** the Duongs." Stephens Decl., ¶¶ 33–34, Exhibits 31 and 32 (Exs. 952 and 5093). Thus, Juarez wanted to generate information he could use to extort the Duongs if their relationship went sideways.

Under Title 18 U.S.C. Sections 2511(2)(d) and 2515, it is a violation of the federal wiretap law for Juarez and Mendez to covertly record the EH board meetings with criminal or tortious intent. *Burleson v. Kernan*, 2007 WL 3478432, at *24 (N.D. Cal. 2007) (Illston). Extortion is both a crime and a tort. *See* 18 U.S.C. Sections 873, 875, and 1951 and California Penal Code Section 518. As a result, for *Napue* purposes, the false testimony from Mendez and Juarez is also material because it paved the way for the introduction of tape recordings by effectively eliminating a viable motion to suppress under Title 18 U.S.C. Section 2511(2)(d). *See United States v. Vest*, 813 F.2d 477, 480–81 (1st Cir. 1987) (affirming trial court order suppressing covert recording for violating 18 U.S.C. Sections 2511(2)(d) and 2515). As a result, as an alternative form of relief for this category of false testimony, defendants respectfully request that the Court suppress the covert recordings of the EH board meetings and strike all admitted evidence derived from those tape recordings.

### C. Juarez Falsely Testified That He "Confessed It All" To The Oakland Police Department On May 5, 2024

On direct examination, the government asked Juarez what he told OPD after the May 3, 2024 incident. Juarez testified that he told OPD "the things that I participated with David Duong, the things that I participated with Andy Duong, that I -- things that I discussed with the mayor and I did for the Mayor of Oakland, Sheng Thao, and how I worked with Andre Jones. ***I confessed it all*** -- on that moment, I was just done." Stephens Decl., ¶ 20, Exhibit 19 (Tr. Vol. 12 at 2724:20–2725:6) (emphasis added). The government did not ask any follow-up questions to clarify how Juarez had failed to disclose his role in certain events as he attempted to shift blame onto others in the self-serving statement he provided to OPD.

On cross-examination, defense counsel questioned Juarez about the statements he made to OPD on May 5, 2024. *Id.* at 2733:5–22. Juarez first affirmed that he told OPD about the

"criminal activities [he] had participated in with David Duong." *Id.* at 2741:10–22. When reminded that he had said on direct that "[he] confessed it all," Juarez testified: "At some point in my conversations with Oakland Police Department and the Department of Justice and the FBI, I confessed it all." *Id.* But when asked whether he had in fact denied his own wrongdoing to OPD on May 5, 2024, he responded: "I don't remember that." *Id.* at 2741:13–22.

After reviewing the transcript of the May 5 interview, which was captured on the OPD officer's body-worn camera, Juarez conceded: "Yeah. I tried to minimize my involvement." *Id.* at 2742:15–19; Stephens Decl. ¶ 28, Exhibit 26 (Ex. 5110 at 14–15). Juarez then claimed not to remember telling OPD, "I'm not going to admit I was helping someone commit a crime," and acknowledged it only after being confronted with a transcript of the officer's body-camera recording. Stephens Decl. ¶ 20, Exhibit 19 (Tr. Vol. 12 at 2742:15–2743:20); *id.* ¶ 28, Exhibit 26 (Ex. 5110 at 14-15). Even then, Juarez would not concede that his direct testimony was false. When asked again whether his claim on direct to have "confessed it all" to OPD was untrue, Juarez answered: "That's not correct." Stephens Decl. ¶ 29, Exhibit 27 (Tr. Vol. 13 at 2788:22–2789:6).

As to the second element of the *Napue* analysis regarding the government's knowledge of the false testimony, the evidence that defense counsel used to question Juarez about his statement to OPD on May 5, 2024 was produced to defense counsel by the government. As a result, the government knew or should have known that Juarez did not "confess it all" to the OPD officer on May 5, 2024, because Juarez minimized his own conduct while focusing the officer's attention on his rivals.

Regarding materiality, Juarez's false testimony about "confessing it all" is material for *Napue* purposes because it impacts Juarez's credibility, and "the jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence." *Glossip*, 604 U.S. at 248 (quoting *Napue*, 360 U.S. at 269). Juarez's credibility would have plainly suffered had the government adequately corrected his false testimony by clarifying that Juarez had misrepresented his own conduct when he provided a self-serving version of the events in dispute in this case to OPD on May 5, 2024. As a result, had the government corrected

Juarez's false testimony, the jury would be more likely to determine that Juarez is both untrustworthy and willing to lie to them. *See id.*; *Dickey*, 69 F.4th at 644 (correcting a witness's false sworn testimony can make a powerful difference in the jury's assessment of the witness's trustworthiness).

**D. Juarez Lied About Both The Origin And Value Of His Gold Chain**

Juarez's testimony regarding the gold chain taken from him on May 3, 2024 was potentially the most emotional testimony to date in the trial. Stephens Decl., ¶ 20, Exhibit 19 (Tr. Vol. 12 at 2722:17–2725:6). Juarez sobbed during this portion of his trial testimony because he claimed that the chain was a gift from his late father. Juarez, however, made two false claims about his gold chain. First, his emotional testimony that the chain was a gift from his late father was false. During his direct testimony, Juarez testified that his late father had given him the gold chain as a gift. *Id*. On cross-examination, Juarez reiterated that the gold chain was his father's chain. Stephens Decl., ¶ 10, Exhibit 9 (Tr. Vol. 16 at 3607:25). On recross examination, however, defense counsel played an audio clip from Juarez's conversation with an OPD officer on May 5, 2024 in which Juarez admitted that his wife, not his deceased father, had given him the gold chain. Stephens Decl., ¶ 30, Exhibit 28 (Exhibit 5112E).

[00:22:09] **JUAREZ**: and but when the rest of the guys show up and the Duongs—I call them the Duongs—disappear into Starbucks.

[00:22:21] **JUAREZ**: They, they, these people corral me in the entrance, and they beat me up. I think I have–

[00:22:28] **OFFICER**: You said they robbed you and beat you up?

**JUAREZ**: **Yeah, they robbed me of a–of a chain that look–that matches this chain.**

**OFFICER**: Uh-huh.

**JUAREZ**: **But thicker. Uh, it's a –, it was – my my wife gifted it to me.** They, uh, stole my Rolex.

**OFFICER:** Uh-huh.

**JUAREZ:** And they stole my phones. And they were trying to do more.

(emphasis added).

Second, on cross-examination on November 10, 2026, Juarez falsely testified that he told OPD the chain was only worth $15,000, not $50,000. Asked by defense counsel for Mr. Jones, Juarez answered: "I believe I said 15,000, Your Honor. I don't believe it 50,000. … I said it was 15,000, 1-5." Stephens Decl., ¶ 31, Exhibit 29 (Tr. Vol. 15 at 3387:2–6). Two days later, on November 12, 2026 on cross-examination by defense counsel for Andy Duong, Juarez repeated his claim regarding what he told OPD about the monetary value of the gold chain: "The chain is worth $15,000, not 50,000. … I told $15,000." Stephens Decl., ¶ 10, Exhibit 9 (Tr. Vol. 16 at 3607:11–3608:5).

The defense then played Exhibit 5112B-1, the body-camera recording of Juarez telling OPD that the chain was worth $50,000. *Id.* at 3608:6–16. On the tape, Juarez confirms to the OPD officer that he thought the value was $50,000—and the officer and Juarez used the numerical digits "5-0" and "1-5" to clearly convey that he was saying $50,000, not $15,000.

**JUAREZ:** They took a-uh, a 2-inch gold chain. 14 carat gold.

[00:29:45] **OFFICER:** How much is that one worth?

**JUAREZ: Probably worth about 50,000 dollars.**

**OFFICER: 5 – 0 or 1 – 5?**

[00:29:51] **JUAREZ: 5 – 0.**

**OFFICER:** Okay, so 2 -inch gold chain, 14 carat worth 50,000.

**JUAREZ:** Yeah.

(emphasis added). Stephens Decl., ¶ 32, Exhibit 30 (Ex. 5112BT at p. 3).

Confronted with the footage from the OPD body-camera on cross-examination, Juarez merely said, "I hear myself." Stephens Decl. ¶ 10, Exhibit 9 (Tr. Vol. 16 at 3608:14–15). On redirect, the government made no effort to clarify that Juarez had testified falsely on cross-examination regarding his gold chain. As a result, the government failed to satisfy its constitutional obligation to assure that the defendants receive a fair trial by failing to take any action on redirect to correct Juarez's false testimony. *See LaPage*, 231 F.3d at 492 (prosecutors have an affirmative constitutional duty to correct false testimony even where the defense attorney cross-examined the witness about the topic because prosecutors possess a special duty to assure

defendants receive a fair trial and jurors view defense attorneys with skepticism given the duty of advocacy they owe their clients); *Clements*, 112 F.4th at 802 (same).

The evidence that defense counsel used to question Juarez about his gold chain—the body-camera footage of the OPD officer interviewing Juarez on May 5, 2024—was produced to defense counsel by the government. As a result, it is undisputed that the government knew or should have known the information demonstrating that Juarez had testified falsely about both the origin and value of his gold chain during cross-examination.

Finally, given all of the emotion that surrounded Juarez's direct testimony regarding this gold chain, the false testimony is material for *Napue* purposes because it impacts Juarez's credibility and "the jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence." *Glossip*, 604 U.S. at 248 (quoting *Napue*, 360 U.S. at 269). Juarez's credibility would have plainly suffered had the government adequately corrected his false testimony because doing so would have confirmed that Juarez is untrustworthy and willing to lie to the jury in the most dramatic, performative way. *See id.*; *Dickey*, 69 F.4th at 644 (correcting a witness's false sworn testimony can make a powerful difference in the jury's assessment of the witness's trustworthiness).

In addition, Juarez is the government's main witness and a cooperating defendant with a motive to lie to obtain a more favorable sentence. *See Bernal-Obeso*, 989 F.2d at 334 ("Criminals caught in our system understand they can mitigate their own problems with the law by becoming a witness against someone else."); *Bowie*, 243 F.3d at 1124 ("[E]ach contract for testimony is fraught with the real peril that the proffered testimony will not be truthful, but simply factually contrived to 'get' a target of sufficient interest to induce concessions from the government."). As such, Juarez's willingness to make such a passionate—and false—emotional appeal to the jury regarding his deceased father combined with his false testimony regarding his report to the OPD officer about the value of the chain demonstrates that Juarez's trial testimony is untrustworthy. In addition, this testimony underscores his willingness to lie to the jury both to seek vengeance against the Duongs and to obtain a sentence reduction for himself.

**E. The Cumulative Impact Of Juarez's Multiple Examples Of False Testimony Exacerbates The Constitutional Prejudice**

Unlike evidentiary issues where cumulative evidence may get excluded as it decreases in relevance, cumulative examples of constitutional violations of a defendant's due process rights do just the opposite—each additional violation increases the need for the Court to intervene and remedy the violation. In other words, Juarez basically took a sledgehammer to the integrity of the criminal justice system when he began to lie to the jury. While Juarez's first swing may not have been a complete knockout punch, his relentless hammering away with false testimony ultimately produced that result. In an analogous context, the Ninth Circuit reversed a conviction by stacking each constitutional violation and concluding that the cumulative effect of those errors resulted in a violation of the defendant's due process right to a fair trial. *See United States v. Preston,* 873 F.3d 829, 835, 842–46 (9th Cir. 2017) (conviction reversed for violation of Due Process Clause where cumulative effect of prosecutorial misconduct during closing argument and other trial errors deprived the defendant of a fair trial).

**F. Dismissal With Prejudice Is The Appropriate Remedy**

Dismissal with prejudice is appropriate here either via the Court's exercise of its supervisory powers or due to the violation of the defendants' Fifth Amendment right to due process. The Ninth Circuit has dismissed indictments with similar misconduct. *See*, *e.g.*, *United States v. Chapman*, 524 F.3d 1073, 1084–88 (9th Cir. 2008) (dismissal of indictment affirmed under trial court's exercise of its supervisory powers related to *Brady* and *Giglio* violations); *United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020) (dismissal of indictment affirmed under trial court's exercise of its supervisory powers related to *Brady*/*Giglio* violations connected to defendants' theory of defense).

While *Brady/Giglio* violations severely impact a defendant's Fifth Amendment right to due process, the Supreme Court and Ninth Circuit recognize that *Napue* violations are more serious. As the Ninth Circuit explained in *Clements,*

> In a consistent throughline of cases even predating *Napue* itself, the Supreme Court has made clear that claims that the prosecution knowingly used false evidence to obtain a conviction are subject to a more lenient materiality standard 'not just because [*Napue* cases]

> involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process.'

112 F.4th at 802–03 (citing *Dickey,* 69 F.4th at 637 (quoting *Agurs,* 427 U.S. at 104)). In addition, the corruption of the truth-seeking function here has been amplified for one reason—Mario Juarez. Heading into this trial, it was undisputed that Juarez was the government's main witness and possessed severe historical credibility issues coupled with an intense drive to seek vengeance against David and Andy Duong. The Ninth Circuit has repeatedly warned that cooperating witnesses like Juarez may "embark on a methodical journey to manufacture evidence and to create something of value, setting up and betraying friends, relatives, and cellmates alike." *Bowie*, 243 F.3d at 1124. Juarez did so here—his false testimony and false evidence have corrupted the criminal justice system and made a mockery out of its constitutional goals and objectives. *Id.*

## V. CONCLUSION

By allowing its main witness—Mario Juarez—to provide false testimony on the key issues in dispute, the prosecution has compromised the integrity of these proceedings thereby violating the defendants' Fifth Amendment right to due process and Sixth Amendment rights to confront their accusers and present a complete defense. Juarez's misconduct even infected the conduct of the prosecution team, which immediately stopped investigating when it appeared that it was about to uncover additional *Brady/Giglio* evidence related to Juarez's misconduct. Because the resulting prejudice is profound and cannot be cured by an instruction to disregard what the jury has already heard, defendants respectfully request that this Court dismiss with prejudice. *See Hayes*, 399 F.3d at 978 ("[R]eversal is virtually automatic where the defense establishes a *Napue* violation"); *Sivak*, 658 F.3d at 912 (same).

As an alternative form of relief regarding the false testimony from both Juarez and Cecilia Mendez related to their covert tape recording of the EH board meetings, defendants request that the Court suppress the tape recordings of the EH board meetings and strike any evidence and testimony derived from or related to those recordings.

Dated: November 21, 2026

JONES DAY

By: *_/s/ Neal J. Stephens_*

Edward W. Swanson
August Gugelmann
SWANSON &McNAMARA LLP

Neal J. Stephens
Jeffrey B. Schenk
Thao Donnelly
JONES DAY

Attorneys for David Trung Duong