# EXHIBIT 19

Volume 12

Pages 2541 - 2773

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. 4:25-cr-00003-YGR** |
| | ) | |
| SHENG THAO, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Oakland, California
Thursday, November 5, 2026

**TRANSCRIPT OF PROCEEDINGS** **(CORRECTED)**

**APPEARANCES:**

For Plaintiff:

CRAIG H. MISSAKIAN
UNITED STATES ATTORNEY
1301 Clay Street
Oakland, California 94612

**BY: ABRAHAM H. FINE**
**MOLLY PRIEDEMAN**
**ASSISTANT UNITED STATES ATTORNEYS**

UNITED STATES ATTORNEY
450 Golden Gate Avenue
San Francisco, California 94102

**BY: LLOYD A. FARNHAM**
**ASSISTANT UNITED STATES ATTORNEY**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
Official United States Reporter, CSR No. 12219

She would always provide counsel and advice and directives on how to do things, how to move money; and finally, decision to assign money.

**Q.** And you mentioned Cecilia Mendez. What was her role at the board meetings?

**A.** Initially Cecilia was there to takes notes. She was tasked with that. She was tasked with maintaining records, to assist with some of the follow-through and directives that were technical in nature. Additionally, she was officially the proxy representing the interests of the shareholder Daniel Johnson, who lived in Tijuana, Mexico, but also was a shareholder of the company.

**Q.** What is your relationship with Ms. Mendez?

**A.** Cecilia was, at one point in my life, my partner. We lived together. We had business together. We have a daughter together, and we consider each other very good friends today.

**Q.** Are you still in regular contact with Ms. Mendez?

**A.** Yes.

**Q.** Do you now, sitting here today, have an understanding as to whether Ms. Mendez was audio recording the Evolutionary Homes' board meetings?

**A.** Today I know that she recorded the meetings, and -- and I didn't know that at the time.

**Q.** Now, in the fall of 2023, the time period that I was drawing your attention to, how much money had Mr. Jones

**BY MR. FINE:**

**Q.** You say, lastly [as read]:

"Lastly, I want to address outstanding reimbursements for travel and other expenses which are essential for maintaining our operational efficiency for me. I was told to go to Mexico and work on tasks, and now two minor items are holding up repayment of my expense report."

What are you describing there?

**A.** So throughout the months after I brought the units, around August, I submitted extensive reports, expenditures, receipts, matching them.

And at times David would say "next week," "next month," "after Chinese New Year," "after this," "after the holidays." But in this particular instance, they said that they had a question on two items.

And it felt really terrible that they were holding up a large amount of reimbursement because of two items. They wanted to know why I charge for medication for diarrhea and also why I charged for a punctured tire on a car to be fixed.

**Q.** And then the last two paragraphs, Mr. Juarez, you say [as read]:

"In closing, I want to reiterate my commitment to the well being and success of Evolutionary Homes. It is essential that we address these concerns

**A.** That is me.
**Q.** And what about the people on the other side of you?
**A.** On the left -- I don't know the name of that employee, but it's a Starbucks employee.
And next to that is a woman with a white shirt. She's the one who turned my head when I was choking, she told me that. And next to her is David Duong.
**Q.** And do you recall where Andy Duong was while this was going on?
**A.** I don't know where he was.
**Q.** I think Mr. Juarez, at this point I'd like to show you a physical exhibit.
**MR. FINE:** I'm now going to show the witness what's already been admitted as Trial Exhibits 1269 and 1270.
**THE COURT:** Proceed.
(Counsel approaches witness.)
**BY MR. FINE:**
**Q.** Mr. Juarez, why don't we start with 1270, which is the chain.
Do you recognize this chain?
**A.** Yes.
**Q.** What is it?
**A.** It's my father's chain.
**Q.** And you say it's your father's chain. What do you mean by that?

**A.** He died. He gave me this chain, and I wore it ever since.
**Q.** And is this the chain that was taken from you on May 3rd?
**A.** Yes.
**Q.** And what about the watch? Do you recognize that?
**A.** Yes, yes.
**Q.** What is it?
**A.** It's my watch. I wore it that day. It was a gift from my wife.
**Q.** Is that the watch that was taken from you?
**A.** Yes.
**Q.** And Mr. Juarez, I think you mentioned some cash was taken from you; is that right?
**A.** Yes.
**Q.** Do you remember approximately how much?
**A.** Thousand dollars, maybe a couple of thousand dollars, and it was in this bag, from Bank of America.
**Q.** And then, Mr. Juarez, you mentioned your phones were taken?
**A.** Yes.
**Q.** How many phones did you have on you at that point?
**A.** Two. I believe it was two.
**Q.** Did you ever get those phones back?
**A.** No.

**MR. FINE:** If we could put up what's already been admitted as Exhibit 1271. If we could zoom in on the chain

part.

**BY MR. FINE**

**Q.** Mr. Juarez, does this chain appear to be broken?

**A.** It's missing the connector link to the lock mechanism.

**Q.** Before May 3rd, before you wore it on May 3rd and it was taken from you, was it broken at this point?

**A.** It was not.

**Q.** Mr. Juarez, after this incident, did you contact law enforcement?

**A.** I did.

**Q.** Why did you contact law enforcement?

**A.** I was done. They crossed the line.

**Q.** Who did you contact?

**A.** I contacted the Oakland Police Department. I contacted the attorney general of the State of California.

**Q.** And what did you report to the Oakland Police Department?

**A.** I told them that there has been an aggravated assault, and I believe -- because I felt that I was dying, that it rise to the level of attempted murder.

**Q.** Did you tell OPD about any of the other allegations from your e-mail that we had just read?

**MR. SPRAGUE:** Objection. Leading and hearsay.

**THE COURT:** Overruled.

**THE WITNESS:** I did tell the OPD that I had information as to the things that I knew, the things that I

participated with David Duong, the things that I participated with Andy Duong, that I -- things that I discussed with the mayor and I did for the Mayor of Oakland, Sheng Thao, and how I worked with Andre Jones. I confessed it all -- on that moment, I was just done. I didn't know anyone was investigating anything.

**BY MR. FINE:**

Q. At some point after that, Mr. Juarez, were you contacted by federal law enforcement?

A. Before that I was contacted by --

Q. I was asking about after that, after you reported to OPD.

A. After I reported to OPD, someone from the Federal Government called me, but some other individuals from Oakland Police Department called me before.

Q. And, Mr. Juarez, before May of 2024, had you had any contact with federal law enforcement regarding this investigation?

A. I didn't know, and I had no knowledge of --

**THE COURT:** The question is yes or no.

**THE WITNESS:** Your Honor, I didn't had any contact with the federal government before this day.

**BY MR. FINE:**

Q. And did you have any knowledge of the federal investigation before May of 2024?

A. I had no knowledge that you guys were investigating this.

**Q.** When did you first sit for a substantive interview with the federal law enforcement?
**A.** It was the end of May, early June. I think it was early June.
**Q.** Of 2024?
**A.** Yes.
**Q.** Mr. Juarez, since then, approximately how many times have you had meetings with the FBI or the U.S. Attorney's Office?
**A.** Dozens of times.
**Q.** What was that?
**A.** Dozens of times.
**Q.** Dozens.
And as part of your interactions with law enforcement, did you provide any pictures of the watch and chain that are in front of you now?
**A.** Yeah. I think one of the agents asked me to provide a copy -- a picture of me wearing the watch and me wearing the chain; and I provided those.
**MR. FINE:** Mr. Costello, if you could put up on the screen what's been -- just for the witness, what's been marked as Exhibit 1263.
**BY MR. FINE:**
**Q.** Mr. Juarez, do you recognize this photo?
**A.** I do.
**Q.** Is this one of the photos you provided to law enforcement?

**A.** It was.

**MR. FINE:** Your Honor, I'd move to admit Exhibit 1263.

**MR. SPRAGUE:** No objection.

**THE COURT:** It's admitted.

(Trial Exhibit 1263 received in evidence.)

**MR. FINE:** And if we could publish.

**BY MR. FINE:**

**Q.** Mr. Juarez, is there a gold chain around your neck in this picture?

**A.** It is.

**Q.** What is that gold chain?

**A.** It's my dad's gold chain.

**Q.** And is that -- go ahead.

**A.** And if you first zoom into the lock, you'll see the King logo, which is in the back. It's a unique logo.

**Q.** And was this picture of you wearing the chain from before May 3rd, 2024?

**A.** It was. It is.

**MR. FINE:** And, Mr. Costello, if we could show just the witness what's been marked as Exhibit 1264.

**BY MR. FINE**

**Q.** Mr. Juarez, is this another picture you provided to the FBI?

**A.** It is.

**MR. FINE:** I'd move to admit Exhibit 1264.

**CROSS EXAMINATION**

**BY MR. SWANSON:**

**Q.** Good afternoon, Mr. Juarez.

**A.** Good afternoon, Mr. Swanson.

**Q.** My name is Ed Swanson. I represent David Duong.

I would like to start sort of where you left off, or close to that, which was your first contact with law enforcement after this incident on May 3rd.

Do you remember talking about that?

**A.** May 3rd, yes.

**Q.** Yes.

And you talked to the Oakland Police Department a couple of days later, on May 5th; correct?

**A.** Yes.

**Q.** And you said you were telling the Oakland Police Department about this incident that you described at CWS on May 3rd; right?

**A.** Yes.

**Q.** You also were telling them about other things that you wanted to report to them involving the Duongs; correct?

**A.** I did tell them about other things that I wanted to report to the police about the Duongs and my activities with them.

**Q.** Actually, what you wanted to know was if your report about the Duongs could go to the FBI; right?

**A.** I think what I wanted to do is to report the crime that

work with on them.
Q. Okay. And so the things that you have done and the things you have worked with with David Duong; is that right?
A. And Andy. I believe I said that too.
Q. I'm sorry. Just one at a time.
So you said -- you told them, essentially, the criminal activities that you had participated in with David Duong; right?
A. Yes.
Q. And the criminal activities that you had participated in with Andy Duong; correct?
A. To a lesser extent, yes.
Q. In fact, what you said today was: I confessed it at all; right?
A. At some point in my conversations with Oakland Police Department and the Department of Justice and the FBI, I confessed it all.
Q. At some point in all of those conversations you did confess it all; right?
But when you went to OPD on May 5th, you denied you did anything wrong; isn't that true, sir?
A. I don't remember that.
Q. Okay. Would it refresh your recollection to take a look at the transcript of this interview that you had on body-worn camera?

**A.** No problem.
**Q.** Okay. I direct your attention, then, to 5110. And this is -- let me make sure I have the right page again.
The time mark here is 24:57. If you look back at page 14 of the transcript -- just ask you to take a look at from 24:54, let's say, to 28:13.
**A.** Page 14, it starts at 27:31, and it ends at 28:36.
**Q.** Right. I'm asking you to take a look at starting at 27:54.
**A.** I see it.
**Q.** Okay. Does that refresh your recollection that when you were talking to law enforcement, that you were saying that you weren't helping them; right?
**A.** Excuse me?
**Q.** Isn't it true -- does this refresh your recollection -- let's start here -- that when you talked to OPD on May 5th, when you say you confessed it all, actually, what you told them was you weren't helping them; correct?
**A.** Yeah. I tried to minimize my involvement.
**Q.** I'm sorry. You said you confessed it all; right? That's what you just told the jury a few minutes ago.
Now, you're saying you tried to minimize your involvement; is that right?
**A.** I said that.
**Q.** Okay. So, in fact, it's not that you just tried to

minimize your involvement. What you said was that you were not going to admit you were helping someone commit a crime; isn't it true you said that?

A. I don't see it in the writing. Do you --

Q. I'm just asking you first: Did you say that?

Did you say, "I'm not going to admit I was helping someone commit a crime"?

A. I don't remember saying that.

Q. Okay. Why don't we take a look at, then, at 28:30, same page.

A. I see it.

Q. All right. Does that refresh your recollection that you told OPD on May 5th, this day that you just told the jury "I confessed it all," that "I'm not going to admit I was helping someone commit a crime"; right?

A. I see it. And I also see that I clarified it even further below.

Q. Right. The officer -- you were asked what you just did, and you said, "but I didn't"; right?

A. But it says that I did afterwards.

Q. Okay. And, in fact, what you said -- what you told OPD is that you were involved in delivering money, but you thought Mr. Jones -- Andre Jones, who you have testified about at length -- that he had a real contract; correct?

**MR. FINE:** Objection. Misstates the transcript.