# EXHIBIT 20

**Volume 9**

**Pages 1852 - 2042**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
VS. ) **NO. 4:25-cr-00003-YGR**
)
SHENG THAO, et al., )
)
Defendants. )
)

Oakland, California
Wednesday, October 28, 2026

**TRANSCRIPT OF PROCEEDINGS (CORRECTED)**

**APPEARANCES:**

For Plaintiff:

CRAIG H. MISSAKIAN
UNITED STATES ATTORNEY
1301 Clay Street
Oakland, California 94612
BY: **ABRAHAM H. FINE**
**MOLLY PRIEDEMAN**
**ASSISTANT UNITED STATES ATTORNEYS**

UNITED STATES ATTORNEY
450 Golden Gate Avenue
San Francisco, California 94102
BY: **LLOYD A. FARNHAM**
**ASSISTANT UNITED STATES ATTORNEY**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
Official United States Reporter, CSR No. 12219

**A.** Yes.

**Q.** Now, Ms. Mendez, I think you testified that Mario Juarez asked you to take notes at the meetings; is that right?

**A.** Yes.

**Q.** Did you make audio recordings of the board meetings?

**A.** Yes, I did.

**Q.** Why did you make audio recordings?

**A.** I recorded all the meetings because Mario asked me to take notes, and I don't have experience taking notes on board meetings. So it was just easier for me to record the meetings for my own use. It was not intended to be given to anybody else.

**Q.** Did you tell anyone at the time that you were recording the board meetings?

**A.** No, I didn't.

**Q.** Did you provide the recordings you made to the FBI?

**A.** Yes, I did.

**MR. FINE:** And, Mr. Costello, if we could, again, publish Exhibit 412. And if we could zoom in on Ms. Mendez and the area of the table in front of her.

**BY MR. FINE:**

**Q.** Ms. Mendez, do you see a pink water bottle there?

**A.** Yes.

**Q.** And then in front of that, do you see what appears to be a cell phone?

**Q.** I'm asking if you do in general. You'll acknowledge that he has a temper; correct?

**MR. FINE:** Objection, Your Honor. Relevance.

**THE COURT:** It's impeachment. It goes to credibility. You can answer the question. Yes or no?

**THE WITNESS:** Yes.

**BY MR. SWANSON:**

**Q.** Okay. Now, you've testified today that no one -- you did not tell anyone that you were recording; correct?

**A.** Correct.

**Q.** Okay. That -- that's -- that's not true. You told Mario Juarez you were recording; correct?

**A.** Eventually, yes.

**Q.** Eventually -- so -- so your testimony today is not correct. In fact, you did tell Mario Juarez you were doing recordings; correct?

**MR. FINE:** Misstates testimony, Your Honor.

**THE COURT:** Sustained as to the form.

**MR. SWANSON:** Okay.

**BY MR. SWANSON:**

**Q.** You, in fact, did -- you testified today that you did not tell anyone you were recording; correct?

**A.** Correct.

**MR. FINE:** Objection. Misstates testimony.

**THE COURT:** Sustained as to the form.

BY MR. SWANSON:
Q. In fact, you're testifying now that you did tell Mario Juarez you were recording; correct?
A. Yes.
Q. And I think you have said that you only told him at the end of the business relationship with the Duongs; is that right?
A. Yes.
Q. Okay. You didn't tell him -- so by the end of the business relationship, when is that? When did you tell him?
A. I don't recall. I'm sorry.
Q. Well, when did the business relationship end?
A. April 2024.
Q. So was it -- your testimony March, April, somewhere around there when you first told him you were doing the recordings?
A. Probably.
Q. And he -- you never told him before that. Is that your testimony?
A. Correct.
Q. Okay. We will return to that with another question. Let me move on.
I understand that the way that you provided the recordings that you said you made to the Government was you uploaded them to a site; is that correct?
A. Yes.

remember that you and Mario had a conversation where you guys could not remember exactly what was the approval given in the meeting in connection with the budget for how much to spend on the lawyers; correct?
**A.** I don't recall the meeting.
**Q.** Do you recall that you and Mario discussed whether or not you could actually hire these particular lawyers because Mr. David Duong, in the December 5 meeting, was unclear about how much you could spend on these lawyers?
**A.** Yes.
**Q.** And then after that discussion, do you recall telling Mr. Juarez, you know what, what I'll do is I'll consult the recording of the December 5 meeting in order to look back to see what it was about the counsel budget that had been approved at that meeting three days earlier.
Do you remember that?
**A.** No, I don't.
**Q.** Can you take a look at the document in front of you at page 608, and read through that exchange and see if that refreshes your memory. And let me know when you're done reading, please.
**A.** (Witness examines document.)
Yes.
**Q.** Does that remind you that on December 8th, three days after the December 5 board meeting, while discussing what had

been approved to spend on lawyers, you told Mr. Juarez "I can check the recording"?
A. Yes, that's what it says here.
Q. And that's because you had told him and discussed with him the fact that you were making these recordings as of at least December 8th, 2023; correct?
A. No, I didn't tell them.
Q. Even though you told him you would consult recordings in order to figure out what had happened in the December 5 meeting?
A. I sent that text, yes, but I never told him that I made those recordings.
Q. In other words, you didn't tell him orally but you told him by text. Is that what you're saying?
A. Yeah, based on that text, yes.
Q. And in the text, he didn't say, "Wait, what recordings," did he?
A. No.
Q. He didn't say, "Why in the world do you need to make recordings," did he?
A. No, he didn't respond.
Q. This is December 2023; correct?
A. Yes.
Q. So when you testified earlier on direct that you never told him, you mean you just never told him out loud; correct?

**A.** Correct.

**Q.** All right. Last few questions, Ms. Mendez.

There came a point in time, as you testified, that the company -- Evolutionary Homes ended; correct?

**A.** Yes.

**Q.** And it didn't end on a positive note. Would you agree with that?

**A.** I agree.

**Q.** That the Duong family and Mr. Juarez did not end on amiable -- on friendly terms; right?

**A.** Correct.

**Q.** And do you remember that, at that time, also that Mr. Juarez was concerned and expressed to you his concern that the Duong family was trying to take the Evolutionary Homes company away from him?

**A.** Can you repeat the question again.

**Q.** Do you remember that Mr. Juarez was worried that the Duongs were taking away Evolutionary Homes from him?

**A.** Yes.

**Q.** And one of the things he told you about was that he had heard that the family would be trying to assemble the homes in Vietnam; right?

**A.** No.

**Q.** You don't remember any conversations with Mr. Juarez about the Duong family plan -- a Duong family plan to build model

A. Yeah, probably. Yes.
Q. Okay. And I think you said the only -- the only person other than you who knew of the recordings at any time was Mario Juarez; right?
A. Eventually, yes.
Q. Eventually.
And we've seen -- you've seen that text that you sent in December of 2023 saying you could go back to your recordings; right?
A. Yes.
Q. All right. So -- so by then, at least, you had -- you had let him know you were doing recordings; right?
A. Yes.
Q. Okay. But you're saying that that -- that that was all on your own; right?
A. Correct.
Q. All right. And the truthful testimony is not that you never told him, and the truthful testimony is not that you told him only at the very end.
The truthful testimony is at least as of December of 2023, you'd let him know; right?
A. Yes.
Q. Okay. I'd like to talk -- one of the issues that came up on one of the exams that you have had was the issue of the invoices.